[No. 9048–5–III.   Division Three.   June 15, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM
MATHERS STEINBRUNN, *Appellant*.

*Leslie Stomsvik,* for appellant.

*Gerald Matosich, Prosecuting Attorney,* for respondent.

THOMPSON, C.J.—William Steinbrunn appeals his jury conviction for vehicular homicide. He contends evidence of samples of his blood showing an alcohol level of .15 should have been suppressed. His theory is twofold: (1) he argues the samples were taken pursuant to an unlawful arrest; *i.e.,* they were taken from him at the direction of a Washington state trooper while he was unconscious in an Oregon hospital, outside the trooper's jurisdiction; and (2) he asserts the State failed to establish a prima facie case that the samples were preserved and tested in accordance with rules adopted by the state toxicologist. We affirm.

At approximately 2:20 a.m. on April 17, 1986, a vehicle driven by Mr. Steinbrunn on a rural highway near the community of Lyle collided head on with a vehicle driven by an off–duty deputy sheriff. The deputy's car was engulfed in flames immediately following the impact, and he was dead at the scene. Mr. Steinbrunn was seriously injured. He was taken by medical personnel to the Mid–Columbia Medical Center in The Dalles, Oregon.

Washington State Trooper James Baldwin was notified of the accident by the dispatcher at approximately 3:05 a.m. At the accident scene, he was informed by sheriff's deputies that one driver was deceased and the other had been taken to the hospital in The Dalles. Trooper Baldwin testified he arrived at the hospital about 4:45 a.m., and found Mr. Steinbrunn in the emergency room. The trooper stated he could smell the odor of intoxicants coming from Mr. Steinbrunn's mouth. Although Mr. Steinbrunn was unconscious, Trooper Baldwin advised him that he was under arrest for vehicular homicide, then directed a registered nurse who was present to draw a blood sample from him.

According to Trooper Baldwin, he provided the nurse with vials with gray stoppers which he had obtained from the state toxicology lab. He stated the vials contained a powder which acted as an anticoagulant. Once the samples were taken, he sealed the vials with medical tape and the next day shipped them to the state toxicology lab.

Robert Baker was the registered nurse who drew the blood sample. He testified he used a hospital vial which he described as a gray–topped tube normally used as a container for blood alcohol samples. He did not believe the vial contained an additive, but admitted that if it did, it would have been a preservative or an anticoagulant. He also stated he drew only one vial of blood.

William Marshall, a state toxicologist, testified that on April 21, 1986, the lab received two vials from Trooper Baldwin marked as containing blood samples from Mr. Steinbrunn. The vials were gray–topped vacutainers, smaller than the ones the lab supplies. Mr. Marshall said that vials containing an anticoagulant and a preservative are manufactured with a gray stopper and are sent "to virtually every hospital in the country". The additives are not necessary for the testing. The lab can break down clotted blood, and the testing here was performed soon enough after the samples were drawn that the blood would not be changed even without the preservative. Any change that did occur would result in a lower blood alcohol reading. Mr. Marshall stated he would have made a written note if the sample was clotted. Thus, there was no doubt in his mind that the vials contained an anticoagulant.

The first question is whether the trooper acted unlawfully when he seized a blood sample from Mr. Steinbrunn in Oregon.

The Supreme Court has held that the law "plainly and properly contemplate[s] that the lawful arrest of an offending motorist would be the indispensable element triggering any implied consent to a sobriety test". *State v. Wetherell,* 82 Wn.2d 865, 869, 514 P.2d 1069 (1973). The court noted the requirement is constitutional in nature, as identified by

the holding in *Schmerber v. California,* 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966). *Wetherell.* In *Schmerber,* the Court held that the extraction of a blood sample from a defendant is tantamount to a search. A warrantless seizure of blood is justified if it is *incident to a lawful arrest coupled with a reasonable emergency, i.e.,* the progressive diminution of the blood alcohol level during the time interval incident to obtaining a search warrant. *Wetherell,* at 870.

The State argues that the Legislature has amended RCW 46.20.308 since *Wetherell* so as to eliminate the requirement of arrest in circumstances in which the defendant is unconscious. However, we do not read the statute as eliminating the requirement of arrest.

RCW 46.20.308 provides:

(1) Any person who operates a motor vehicle within this state is deemed to have given consent . . . to a test or tests of his or her breath or blood for the purpose of determining the alcoholic content of his or her breath or blood *if arrested for any offense* where, at the time of the arrest, the arresting officer has reasonable grounds to believe the person had been driving or was in actual physical control of a motor vehicle while under the influence of intoxicating liquor.

. . .

(3) . . . If an individual is unconscious or is under arrest for the crime of vehicular homicide as provided in RCW 46.61.520 or vehicular assault as provided in RCW 46.61.522, or if an individual is under arrest for the crime of driving while under the influence of intoxicating liquor or drugs as provided in RCW 46.61.502, which arrest results from an accident in which another person has been injured and there is a reasonable likelihood that such other person may die as a result of injuries sustained in the accident, a breath or blood test may be administered without the consent of the individual *so arrested.*

(Italics ours.) In the State's view, the final two words of subsection (3) refer to persons under arrest for the crimes specified in that subsection. We disagree. The phrase "so arrested" refers to an unconscious defendant, as well.

"When interpreting a statute, every presumption favors the validity of an act of the Legislature, all doubts must be resolved in support of the act, and it will not be declared unconstitutional unless it clearly appears to be so." *Grant v. Spellman,* 99 Wn.2d 815, 819, 664 P.2d 1227 (1983). *See also* 2A C. Sands, *Statutory Construction* § 45.11 (4th ed. 1973). Under our interpretation, RCW 46.20.308 is constitutional.

Thus, Trooper Baldwin had to lawfully arrest Mr. Steinbrunn before he could seize a sample of his blood without a warrant. Mr. Steinbrunn argues the arrest here was unlawful, relying on the general rule that a peace officer has no official power to arrest beyond the territorial boundary of the jurisdiction for which he is elected or appointed. *See Irwin v. Department of Motor Vehicles,* 10 Wn. App. 369, 371, 517 P.2d 619 (1974), and authorities cited there. But an exception to that rule is set forth in the Uniform Act on Fresh Pursuit, codified in Washington at RCW 10.89.

RCW 10.89.010 states:

> Any member of a duly organized state, county or municipal peace unit of another state of the United States who enters this state in fresh pursuit, and continues within this state in such fresh pursuit, of a person in order to arrest him on the ground that he is believed to have committed a felony in such other state, shall have the same authority to arrest and hold such person in custody as has any member of any duly organized state, county or municipal peace unit of this state, to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state.

RCW 10.89.050 defines "fresh pursuit":

> The term "fresh pursuit" as used in this chapter, shall include fresh pursuit as defined by the common law, and also the pursuit of a person who has committed a felony or who reasonably is suspected of having committed a felony. It shall also include the pursuit of a person suspected of having committed a supposed felony, though no felony actually has been committed, if there is reasonable ground for believing that a felony has been committed.

*Fresh pursuit as used herein shall not necessarily imply instant pursuit, but pursuit without unreasonable delay.*

(Italics ours.) Or. Rev. Stat. § 133.410–.440 (1987) is identical to the Washington law.

█ Here, Trooper Baldwin followed Mr. Steinbrunn into Oregon as soon as he was able to leave the accident scene. When he smelled the odor of intoxicants on Mr. Steinbrunn's person in the hospital emergency room, he had probable cause to arrest Mr. Steinbrunn for vehicular homicide. Pennsylvania has construed the uniform statute as not requiring that the officer have probable cause to arrest at the time he crossed the territorial boundary:

> The Intra–State Hot Pursuit statute does not require that probable cause for an arrest exist *before* a pursuing officer crosses the boundary of his political subdivision. By its terms, the statute confers extraterritorial authority to make an arrest when (1) an offense has been committed within the officer's political subdivision; (2) pursuit continues following commission of the offense; and (3) the officer exercises only that power of arrest which he would have if he were acting in his own jurisdiction. We do not believe that the legislature intended to make the knowledge possessed by the officer at the time the territorial boundary is crossed to be determinative of the validity of an arrest made pursuant to this statute. Often, pursuit of a criminal suspect has its inception in an officer's reasonable belief that criminal activity has occurred or is about to occur. As "the chase" ensues, pertinent information is radioed to the officer or the officer makes certain observations with respect to the suspect which then give rise to probable cause for purposes of effectuating a valid arrest. The point at which probable cause arises is immaterial under this statute.

*Commonwealth v. Montgomery,* 513 Pa. 138, 144, 518 A.2d 1197, 1200 (1986). *See also Hutchinson v. State,* 38 Md. App. 160, 380 A.2d 232, 236–38 (1977), and cases cited therein.[1]

---

[1]The only Washington case we have located under the statute is *State v. Malone,* 106 Wn.2d 607, 608–09, 724 P.2d 364 (1986), which held an Idaho officer

■ Nevertheless, Mr. Steinbrunn argues that the prosecutor was required to plead and prove at trial the fact of Oregon's adoption of the uniform act. He relies on *Lagomarsino v. Pacific Alaska Nav. Co.*, 100 Wash. 105, 113, 170 P. 368 (1918), which denied the defense of a California statute to a party who had not pleaded or proved the statute. *Lagomarsino* is distinguishable. There, Washington did not have the same statute as California. Here, the State could rely on the rule that unless the law of another state is specifically pleaded, it will be presumed to be the same as that of Washington. *Granite Equip. Leasing Corp. v. Hutton*, 84 Wn.2d 320, 324, 525 P.2d 223, 72 A.L.R.3d 1172 (1974). The Superior Court was entitled to presume that Oregon law was the same as Washington law.

■ Mr. Steinbrunn also asserts that Trooper Baldwin did not follow the provisions of the Uniform Act on Fresh Pursuit. Specifically, RCW 10.89.020 provides that if an arrest is made, the out-of-state officer is to take the person arrested before a magistrate of the county in which the arrest was made for the purpose of determining the lawfulness of the arrest. If the magistrate determines the arrest was lawful, then he commits the person to await extradition. This procedure does not apply here. Officer Baldwin's purpose was not to keep Mr. Steinbrunn in custody and he made no attempt to do so.

We conclude Trooper Baldwin lawfully arrested Mr. Steinbrunn in Oregon. Therefore, the court did not err when it admitted the evidence of the blood samples.

The second issue is whether the State established a prima facie case that the blood samples were free from adulteration and tested in accordance with the rules of the state toxicologist. RCW 46.61.506(3) provides:

---

had no authority to arrest the defendant in Washington for eluding a police officer because Idaho had no statute making that act a crime.

Analysis of the person's blood . . . to be considered valid . . . shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose.

Under WAC 448–14–020(3),

(a) A chemically clean dry container consistent with the size of the sample with an inert leak–proof stopper shall be used.

(b) Blood samples for alcohol analysis shall be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration.

Here, the testimony of toxicologist Marshall and of registered nurse Baker is similar to the testimony in *State v. Barefield,* 47 Wn. App. 444, 457, 735 P.2d 1339 (1987), *aff'd,* 110 Wn.2d 728, 756 P.2d 731 (1988), which the court held sufficient to establish a prima facie case that the sample was unadulterated. *Barefield,* 47 Wn. App. at 458. The nurse testified the vial was supplied by the hospital, and the toxicologist testified that this vial manufacturer always puts anticoagulants in this type of vial, although, in his opinion, the presence or absence of anticoagulants would not affect the test.

A prima facie case having been made, it was for the jury to determine the weight to attach to the evidence. *Hoffman v. Tracy,* 67 Wn.2d 31, 35, 406 P.2d 323 (1965). The discrepancy in testimony as to the number of vials of blood taken from Mr. Steinbrunn goes to the weight rather than the admissibility of the evidence.

Affirmed.

MUNSON and SHIELDS, JJ., concur.

Review denied at 113 Wn.2d 1015 (1989).