## STATE OF CONNECTICUT *v.* FRANCES I. STEVENS
## (14525)

*(Two justices dissenting)*

Argued November 5, 1992—decision released February 23, 1993

*William W. Fisher, Jr.,* with whom was *John J. O'Brien,* for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, and *Peter McShane,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant challenges the authority of a Connecticut police officer to conduct a consensual postarrest investigation in another state. The defendant, Frances I. Stevens, was charged in a two count information with assault in the second degree with a motor vehicle while intoxicated in violation of General Statutes § 53a-60d and with operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a.[1] The trial court admitted into evidence the results of two sobriety tests that were administered in Rhode Island and of tests on two blood samples that were obtained from the defendant in Rhode Island. The evidence had been

___

[1] "[General Statutes] Sec. 53a-60d. ASSAULT IN THE SECOND DEGREE WITH A MOTOR VEHICLE: CLASS D FELONY. (a) A person is guilty of assault in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes serious physical injury to another person as a consequence of the effect of such liquor or drug.

"(b) Assault in the second degree with a motor vehicle is a class D felony and the court shall suspend the motor vehicle operator's license or nonresident operating privilege of any person found guilty under this section for one year."

General Statutes § 14-227a (a) provides: "OPERATION WHILE UNDER THE INFLUENCE. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight."

gathered at the request of Officer Louis Diamanti of the Stonington police department. Following the defendant's conviction by a jury on both counts, the trial court sentenced her to a term of imprisonment of one year, execution suspended, on the first count and a concurrent term of six months imprisonment, execution suspended, on the second count. The trial court also suspended the defendant's motor vehicle operator's license for one year and placed her on probation for a period of one year subject to certain conditions.[2] The defendant appealed to the Appellate Court, which affirmed the trial court's judgment. *State v. Stevens*, 26 Conn. App. 805, 603 A.2d 1203 (1992). We granted the defendant's petition for certification to appeal to this court.[3] We now affirm the judgment of the Appellate Court.

The Appellate Court accurately set forth the facts relevant to this appeal. "On January 31, 1990, the defendant, a Rhode Island resident, was driving her car accompanied by a dinner companion, Rose Buck, in the Pawcatuck section of Stonington at about 11 p.m. on a poorly lighted, narrow hilly road. The defendant had been drinking wine at a restaurant earlier that evening with Buck and another friend. Behind the defendant's car, Keith Beebe, an off duty Stonington police

[2] The one year period of probation imposed on the defendant included the following special conditions: no operation of a motor vehicle, performance of community service, alcohol counseling and treatment.

[3] We granted certification to appeal on the following issue: "Does a Connecticut police officer who has made a valid arrest in this state have the authority to accompany the arrested person to Rhode Island and there to conduct sobriety and blood tests with the consent of the arrested person?" *State v. Stevens*, 221 Conn. 926, 608 A.2d 691 (1992). In her brief and before this court, the defendant limited her argument to the question of the authority of the police officer to request the two blood samples on which tests were conducted. For that reason and because we conclude that the officer had the authority to request the blood samples, a request that required a greater intrusion, we do not separately analyze the authority of the officer extraterritorially to conduct sobriety tests.

officer, was driving with a friend, Amos Steadman. The defendant's car rounded a curve on the two lane road and Beebe lost sight of it. As he reached the other end of the curve, he saw that the defendant's car had gone off the road and crashed into a tree. The car's front end was heavily damaged.

"While Steadman went to summon help, Beebe tried unsuccessfully to open the car doors as Buck screamed in pain. While talking with the defendant, Beebe noticed that her eyes were bloodshot and glassy, her speech slurred. He smelled alcohol on her breath, and she told him she had been drinking wine that evening. At about 11:07 p.m., two on duty Stonington police officers, Randy Holt and Louis Diamanti, arrived. They also spoke with the defendant, smelled alcohol on her breath, noticed her glassy eyes and concluded, as did Beebe, that she was under the influence of alcohol. The defendant also told Diamanti that she had been drinking wine that evening.

"At about 11:15 p.m., an ambulance came to take the women to the Westerly Hospital in Westerly, Rhode Island, the closest medical facility.[4] Buck had suffered serious chest and rib injuries, and internal bleeding. She underwent surgery for removal of her spleen and remained in intensive care for three weeks thereafter. The defendant, after being fitted with a neck brace, was removed from the car and placed in an ambulance. Before the ambulance left, however, Diamanti entered the vehicle and conducted a horizontal gaze nystagmus test[5] to determine if the defendant was intoxicated.

[4] "The Rhode Island hospital is about five to ten minutes from the accident scene. The nearest medical facilities in Connecticut, Lawrence and Memorial Hospital in New London, and Backus Hospital in Norwich, are about twenty-five to thirty minutes away." *State* v. *Stevens,* 26 Conn. App. 805, 808 n.1, 603 A.2d 1203 (1992).

[5] "A gaze nystagmus test is a method of detecting whether a person is under the influence of alcohol by observing the movement of the eyes. *State*

Because the results, along with his prior observations, led him to conclude that she was intoxicated, he then placed her under arrest at about 11:30 p.m. as she lay on a stretcher in the ambulance, waiting to leave for the hospital.[6]

"Diamanti then rode to the hospital in the ambulance with the defendant. In the emergency room, a doctor examined her and told Diamanti she was suffering from chest bruises. At 12:07 a.m. on February 1, 1990, after the examination was completed, Diamanti gave the defendant *Miranda*[7] warnings. She was coherent and sitting upright in a bed at this time. Diamanti then asked if he could perform two more sobriety tests, and the defendant agreed.[8] He also read her Connecticut's implied consent law[9] and offered her the chance to contact an attorney, which she chose not to do. When he requested that she submit to two blood tests, she voluntarily consented. At 1 a.m. and again at 1:30 a.m., blood was taken by the defendant's attending doctor, a physician licensed by the state of Connecticut. Diamanti then issued the defendant a summons. After the blood was sealed and placed in a kit Diamanti had brought from Stonington, he took it back to Connecticut for

---

v. *Henderson,* 114 Idaho 293, 302 n.1, 756 P.2d 1057 (1988) (Walters, J., pro tem., dissenting)." *State* v. *Stevens,* 26 Conn. App. 805, 808 n.2, 603 A.2d 1203 (1992).

[6] "Diamanti charged her with operating a motor vehicle under the influence of alcohol in violation of General Statutes § 14-227a. Prior to trial, by way of an amended information, the state added the charge of assault in the second degree with a motor vehicle while intoxicated in violation of General Statutes § 53a-60d." *State* v. *Stevens,* 26 Conn. App. 805, 808 n.3, 603 A.2d 1203 (1992).

[7] "*Miranda* v. *Arizona,* 384 U.S. 436, 467–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)." *State* v. *Stevens,* 26 Conn. App. 805, 808 n.4, 603 A.2d 1203 (1992).

[8] "Diamanti had the defendant recite the alphabet and perform a finger count test." *State* v. *Stevens,* 26 Conn. App. 805, 808 n.5, 603 A.2d 1203 (1992).

[9] "See General Statutes § 14-227b." *State* v. *Stevens,* 26 Conn. App. 805, 809 n.6, 603 A.2d 1203 (1992).

laboratory analysis. The first sample showed a blood alcohol level of .13; the second disclosed a .12 level. At trial, Sanders F. Hawkins, the state's chief toxicologist, estimated that at the time of the collision, the defendant's blood alcohol level was between .14 and .17." *State* v. *Stevens,* supra, 807–809.

The defendant does not challenge the Appellate Court's conclusion that "Diamanti had lawfully arrested the defendant at the accident scene pursuant to General Statutes § 14-227a."[10] Id., 811. The defendant concedes, moreover, that the results of the tests on the blood that the officer obtained in Rhode Island would have been admissible if the blood had been taken at either of the more distant Connecticut hospitals rather than at the Rhode Island hospital to which she was transported. The defendant, nonetheless, challenges the conclusion of the Appellate Court that the results of the tests of the two blood samples were properly admitted into evidence by the trial court. Specifically, she argues that Diamanti had no authority to act as a police officer outside his territorial jurisdiction. To attack the authority of Diamanti to gather evidence in Rhode Island, the defendant relies upon § 14-227b (b).[11] That subsection designates a "police officer" as the one

[10] See footnote 1.

[11] General Statutes § 14-227b (b) provides: "If any such person, having been placed under arrest for manslaughter in the second degree with a motor vehicle or assault in the second degree with a motor vehicle or for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both or while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, and thereafter, after being apprised of his constitutional rights, having been requested to submit to a blood, breath or urine test at the option of the police officer, having been afforded a reasonable opportunity to telephone an attorney prior to the performance of such test and having been informed that his license or non-resident operating privilege will be suspended in accordance with the provisions of this section if he refuses to submit to such test or if he submits to such test and the results of such test indicate that at the time of the alleged offense the ratio of alcohol in his blood was ten-hundredths of one

who shall request a chemical analysis after advising an arrestee of the choices available under the "implied consent" statute and who also must advise the arrestee of the right to contact an attorney and who must make the appropriate related notations upon the records of the police department.[12] The defendant strictly interprets the term "police officer" and maintains that because Diamanti lacked any official capacity to conduct a postarrest investigation outside of his territorial jurisdiction he was not acting as a "police officer" when he advised the defendant and obtained samples of her blood.

"Although we recognize the fundamental principle that criminal statutes are to be construed strictly, 'it is equally fundamental that the rule of strict construction does not require an interpretation which frustrates

---

per cent or more of alcohol, by weight, and that evidence of any such refusal shall be admissible in accordance with subsection (f) of section 14-227a and may be used against him in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that he informed the person that his license or nonresident operating privilege would be suspended if he refused to submit to such test or if he submitted to such test and the results of such test indicated that at the time of the alleged offense the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight."

[12] Many of the defendant's assertions in her brief appear to imply a claim that the evidence collected in Rhode Island was obtained in violation of her right to due process. Because, as the defendant concedes, however, the blood samples were not drawn until after Diamanti had advised her of her *Miranda* rights, had informed her of Connecticut's implied consent statute and had provided her with the opportunity to contact an attorney, we conclude that the evidence gathering in Rhode Island did not violate the defendant's due process rights. See *People* v. *Rowe,* 128 Ill. App. 3d 721, 724-25, 471 N.E.2d 578 (1984) (although the police officers had no authority to arrest the defendant outside of their jurisdiction, evidence of breathalyzer test was admissible provided that the evidence was voluntarily given after receiving *Miranda* warnings). We did not certify and do not here decide the case in which consent is lacking.

an evident legislative intent.' " *State* v. *Dolphin,* 203 Conn. 506, 523–24, 525 A.2d 509 (1987), quoting *State* v. *Ellis,* 197 Conn. 436, 445, 497 A.2d 974 (1985). "It is also a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results." *State* v. *Siano,* 216 Conn. 273, 278, 579 A.2d 79 (1990), and cases cited therein. We, therefore, reject the defendant's construction of the statute because it leads to the absurd result that mere fortuity would bar the progress of the criminal prosecution against her in any jurisdiction despite the overwhelming evidence of the existence of probable cause to believe that she had committed serious violations of the law.

Because the violations occurred in Connecticut, the courts of Rhode Island would have had no jurisdiction over the defendant's offenses.[13] *Gilbert* v. *Steadman,* 1 Root (Conn.) 403 (1792); A. Spinella, Connecticut Criminal Procedure (1985) § 3A, pp. 18–19. The extent of a sovereignty's jurisdiction to enforce its civil and criminal laws has long been viewed as being coterminous with its territory. See *Pennoyer* v. *Neff,* 95 U.S. 714, 722, 24 L. Ed. 565 (1878).[14] "It is a general rule of universal acceptation that one State or sovereignty

[13] The parties concede that Rhode Island police officers could not have administered the tests pursuant to Connecticut General Statutes § 14-227a.

[14] In the aftermath of *International Shoe Co.* v. *Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945), many states adopted "long arm" statutes in order to bring within the civil jurisdiction of forum courts persons involved in specified events or transactions that could be regarded as providing "minimum contacts" with the forum state. See, e.g., General Statutes § 52-59b (a); see also P. Kurland, "The Supreme Court, the Due Process Clause and the In Personam Jurisdiction of State Courts," 25 U. Chi. L. Rev. 569 (1958); note, "Transient Jurisdiction is Here to Stay: *Burnham* v. *Superior Court of California,*" 23 Conn. L. Rev. 1125, 1131–47 (1991). Subsequently, California and other states adopted long arm civil statutes that reach as far as their state constitutions and the federal constitution permit. See Cal. Civ. Proc. Code § 410.10 (Deering 1991). For

cannot enforce the penal laws of another, nor punish offenses committed in and against another State or sovereignty." *State* v. *Volpe,* 113 Conn. 288, 294, 155 A. 223 (1931); *Taintor* v. *Taylor,* 36 Conn. 242, 252–53 (1869); see also *The Antelope,* 23 U.S. (10 Wheat.) 337, 344, 6 L. Ed. 268 (1825) (Marshall, C. J., with, inter alios, Story, J.); J. Story, Conflict of Laws (1834) § 620; 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 393. If, therefore, the defendant cannot be effectively prosecuted in Connecticut, she cannot be prosecuted at all.

Even substantive rights based on foreign laws, however, have been given extraterritorial effect. *Broderick* v. *McGuire,* 119 Conn. 83, 101–102, 174 A. 314 (1934). Courts have also held that even a criminal statute may have extraterritorial effect. See, e.g., *Strassheim* v. *Daily,* 221 U.S. 280, 284, 31 S. Ct. 558, 55 L. Ed. 735 (1910) (upholding prosecution in Michigan for acts of bribery and obtaining public money under false pretenses by defendant in Illinois, offenses by their nature peculiarly injurious to the state of Michigan); see also *People* v. *Tyler,* 7 Mich. 161, 221 (1859) ("every sovereignty has the right, subject to certain restrictions, to protect itself from, and to punish as crimes, certain acts which are peculiarly injurious to its rights or interests, or those of its citizens, *wherever committed").* (Emphasis in original.) The Model Penal Code, moreover, expands the concept of territorial jurisdiction to include a variety of interstate activities. See, e.g., 1 American Law Institute, Model Penal Code and Commentaries (1985) § 1.03 (providing that a state has

an example of a long arm penal statute that mirrors the California approach, see Georgia Code Ann. § 17-2-1 (a) (1990), which provides: "It is the policy of this state to exercise its jurisdiction over crime and persons charged with the commission of crime to the fullest extent allowable under, and consistent with, the Constitution of this state and the Constitution of the United States."

jurisdiction over any crime in which at least one element of the crime occurred within the state).

Provided that due process is accorded to the accused,[15] we need only balance the legitimate interests of the adjoining sovereignties to determine whether an extraterritorial police investigation implicates protections normally associated with the territorial concept of jurisdiction. In light of Rhode Island General Law § 12-7-16,[16] which authorizes "any one" to arrest or to seize evidence after the commission of "any offense," and Rhode Island General Law § 12-8-3,[17] which authorizes peace officers from other states who enter Rhode Island in fresh pursuit to make arrests, we discern no interest of Rhode Island that was violated by the taking of blood samples that must be balanced against Connecticut's statutory scheme reflecting an unambiguous policy aimed at ensuring that our highways are safe from the carnage associated with drunken drivers. See *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990); *Quinnett* v. *Newman,* 213 Conn. 343, 350 n.1, 568 A.2d 786 (1990) (*Peters, C. J.,* dissenting); *State* v. *Boucher,* 207 Conn. 612, 617–18, 541 A.2d 865 (1988); *Shore* v. *Stonington,* 187

---

[15] See footnote 12.

[16] Rhode Island General Law § 12-7-16 provides: "The authority given to any one to arrest any person or seize any thing, while such person is actually engaged or such thing is actually used or employed in the commission of any offense, shall not be so construed as to prevent, if not so arrested or seized, the arrest of such person or the seizure of such thing after the commission of such offense, upon due process of law."

[17] Rhode Island General Laws § 12-8-3 provides: "Any member of a duly organized state, county or municipal peace unit of another state of the United States who enters this state in close pursuit, and continues within this state in such close pursuit, of a person in order to arrest him on the ground that he has committed a felony in such other state, shall have the same authority to arrest and hold in custody such person, as members of a duly organized state, county or municipal peace unit of this state have, to arrest and hold in custody a person on the ground that he has committed a felony in this state."

Conn. 147, 162 n.2, 444 A.2d 1379 (1982) (*Peters, C. J.,* dissenting); *Nelson* v. *Steffens,* 170 Conn. 356, 364, 365 A.2d 1174 (1976).

"As a general rule, a police officer acting outside his or her jurisdiction does not act in his or her official capacity and does not have any official power to arrest."[18] *State* v. *Slawek,* 114 Wis. 2d 332, 335, 338 N.W.2d 120 (1983).[19] That does not mean, however, that the results of tests to determine intoxication administered by an officer outside of the officer's territorial jurisdiction are not admissible in court as evidence. *People* v. *Rowe,* 128 Ill. App. 3d 721, 471 N.E.2d 578 (1984).

It is ludicrous to suggest that, because Diamanti was sensitive to the defendant's medical needs in conducting his investigation of the accident, the results of that investigation must now be suppressed. Diamanti commendably did not insist that the defendant be trans-

---

[18] The defendant neither disputes that the arrest took place in Connecticut nor contends that her arrest was otherwise illegal.

[19] Extraterritorial arrests by police officers have been upheld when made under circumstances that authorize a citizen's arrest. See *State* v. *Hodgson,* 57 Del. 383, 200 A.2d 567 (1964); *People* v. *O'Connor,* 167 Ill. App. 3d 42, 44, 520 N.E.2d 1081 (1988); *State* v. *O'Kelly,* 211 N.W.2d 589, 595 (Iowa 1973), cert. denied, 417 U.S. 936, 94 S. Ct. 2652, 41 L. Ed. 2d 240 (1974); *State* v. *Shienle,* 218 Kan. 637, 642–43, 545 P.2d 1129 (1976); *State* v. *Bickham,* 404 So. 2d 929, 932 (La. 1981); *Wright* v. *State,* 58 Md. App. 447, 453–54, 473 A.2d 530 (1984); *Commonwealth* v. *Gullick,* 386 Mass. 278, 283, 435 N.E.2d 348 (1982); *State* v. *McDole,* 734 P.2d 683, 688 (Mont. 1987); *State* v. *Baton,* 488 A.2d 696, 700 (R.I. 1985); *State* v. *MacDonald,* 260 N.W.2d 626, 627 (S.D. 1977).

At common law, a sheriff could legally retake a prisoner who had escaped into another jurisdiction. *Pearl* v. *Rawdin,* 5 Day (Conn.) 244, 249–50 (1812), and cases cited therein. "When an officer holds any person a prisoner in legal custody, on arrest, and the prisoner escapes by force, or otherwise, against his will, the officer has a right to his body, and the power to retake him, at any place to which he may abscond. It is a matter of no consideration, whether his original writ could have been legally served within the jurisdiction, in which he retakes him; for he retakes him, not by that writ, but by virtue of the hold he had on him by the arrest." Id., 249.

ported to one of the more distant Connecticut hospitals for the taking of the blood samples because "the dictates of public policy require . . . that police officers who have a citizen in their lawful custody be not deterred from acting to protect the well-being of such person, particularly in circumstances arising out of an emergency . . . ." *Cioci* v. *Santos,* 99 R.I. 308, 315, 207 A.2d 300 (1965). Diamanti deferred instead to the judgment of emergency medical personnel who had decided to transport the injured defendant to the closest hospital, which happened to be located in Rhode Island. In similar circumstances, courts of other states have held that the fact that evidence had been gathered outside an officer's territorial jurisdiction does not require suppression of the evidence. *State* v. *Locke,* 418 A.2d 843 (R.I. 1980) (police officer was justified in transporting defendant outside of the jurisdiction and properly conducted a breathalyzer test). "The transport of defendant across State lines was merely fortuitous and should not work to clear defendant of the charges." *People* v. *Preston,* 205 Ill. App. 3d 35, 42, 563 N.E.2d 80 (1990) (officer lawfully crossed state line in order to provide Illinois implied consent warning for purpose of obtaining blood test to check blood alcohol level of motorist who had been transported to Iowa hospital); see also *State* v. *Griffiths,* 113 Idaho 364, 369–70, 744 P.2d 92 (1987) (officer outside territorial limits of his authority could request motorist to submit to blood alcohol content test in accordance with the Idaho implied consent statute); *State* v. *Torgerson,* 453 N.W.2d 698 (Minn. 1990) (Minnesota officer properly arrested and administered sobriety tests to defendant after ambulance personnel had transported defendant to a nearby North Dakota hospital); *State* v. *Steinbrunn,* 54 Wash. App. 506, 512, 774 P.2d 55 (1989) (defendant, injured in car accident in Washington, transported to Oregon hospital where Washington state trooper

arrested him while he lay unconscious and ordered nurse to draw blood samples; held that Washington officer acted lawfully).

We find nothing in the language or legislative history of § 14-227b to suggest that the legislature intended that a police officer should endanger the life of an arrestee by contravening the judgment of emergency medical personnel and requiring them to transport the arrestee to a more distant hospital so that the officer may gather evanescent evidence on Connecticut soil. The United States Supreme Court has stated that "the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions." *Breithaupt* v. *Abram*, 352 U.S. 432, 439–40, 77 S. Ct. 408, 1 L. Ed. 2d 448 (1957).

The defendant argues, however, that Diamanti was without authority to request an evidentiary test because he ceased to be a "police officer" for purposes of § 14-227b when he entered Rhode Island. We disagree. "It would be absurd to allow an intrusive measure such as an arrest and, yet, prohibit the lesser intrusion of requesting a blood-alcohol test. Absurd or unreasonable consequences must be avoided when construing statutes." *State* v. *Griffiths*, supra, 369. We find no justification in law or in reason to conclude that the Rhode Island state line, crossed to accommodate the medical needs of an accident victim, constitutes an impenetrable barrier to the introduction of evidence of test results from blood obtained by a Connecticut police officer with the consent of a defendant who had been lawfully arrested. Diamanti, although bereft of some of his statutory and common law authority outside of Connecticut and the municipality that employed

him, did not cease to be a Connecticut "police officer" for the purposes of § 14-227b when he crossed the Rhode Island border.[20]

Accordingly, we conclude that Diamanti's actions were lawful, as well as reasonable, and that the trial court properly denied the defendant's motion to suppress the evidence of test results from blood tests obtained in Rhode Island.

The judgment of the Appellate Court is affirmed.

In this opinion BORDEN and SANTANIELLO, Js., concurred.

KATZ, J., with whom BERDON, J., joins, dissenting. Because I believe that General Statutes § 14-227b (b) authorizes only police officers to order intoxication tests and that Officer Diamanti ceased to have the authority of a police officer when he crossed the Rhode Island border, I respectfully dissent. The state introduced the results of the defendant's blood test into evidence to prove intoxication pursuant to General Statutes § 14-227b (b).[1] Section 14-227b (b) grants to police officers the authority to request a blood, breath or urine test to determine if a driver is intoxicated. Unlike the cases cited by the Appellate Court, as well as those referenced in footnote 19 of the majority opinion, which provide that a police officer may make arrests as a private citizen, § 14-227b (b) permits only a police officer to perform under its aegis.

[20] In *State* v. *MacDonald,* 260 N.W.2d 626 (S.D. 1977), the court reviewed an extraterritorial arrest by a police officer and held that the officer had the authority to make the arrest as a private citizen. The defendant claimed further that the officer could not request chemical testing for intoxication because the implied consent statute required that the testing be administered at the direction of a law enforcement officer. The court held that the policeman was a law enforcement officer for the purposes of the implied consent statute. Id., 628.

[1] See footnote 11 of the majority opinion.

Enacted in 1963, § 14-227b has been frequently amended. In 1981, the statute was amended to require the police officer making the arrest to report the operator's refusal to submit to a blood test. Public Acts 1981, No. 81-446. The statute was amended in 1983 to enable the police officer to determine whether to administer the breath or urine test to the driver who has refused or is unable to submit to a blood test. This amendment further required that the police officer advise the driver that evidence of his refusal to submit to a test will be admissible and may be used against him in a criminal prosecution and to make a report that he had so informed the driver. Public Acts 1983, No. 83-534. In 1985, Public Acts 1985, No. 85-596 amended subsection (b) to add the requirement of affording the operator a reasonable opportunity to telephone an attorney prior to performance of the test. Each of these amendments, as well as others less central to the claim before this court, makes significant demands on the law enforcement officer with serious ramifications to the operator. See *Volck* v. *Muzio,* 204 Conn. 507, 511, 529 A.2d 177 (1987).[2] Accordingly, the results of these tests can be introduced into evidence pursuant to General Statutes § 14-227b (b) only if they are obtained by a *police officer.*

When Diamanti crossed the Connecticut border into Rhode Island, he no longer possessed the authority to act as a police officer. The Connecticut police generally have no authority to enforce Connecticut laws beyond this state's boundaries. See General Statutes

_____

[2] In *Volck* v. *Muzio,* 204 Conn. 507, 511, 529 A.2d 177 (1987), we held that only certain violations of General Statutes § 14-227b (b) impact the administrative license suspension hearing provided in § 14-227b (d). As this court noted in *Weber* v. *Muzio,* 204 Conn. 521, 523, 528 A.2d 828 (1987), however, if a criminal prosecution is involved, as in this case, noncompliance with the requirements of § 14-227b (b) can have a significant impact on the use of the evidence of the results of the intoxication tests or the refusal to submit to these tests.

§ 7-148 (c) (4) (A) (authorizing municipalities to provide police protection *within the limits of that municipality*); General Statutes § 29-7 (providing that "[a]ll state policemen shall have, *in any part of the state,* the same powers with respect to criminal matters and the enforcement of the law relating thereto as . . . policemen . . . have in their respective jurisdictions"). As the majority recognized, "[a]s a general rule, a police officer acting outside his or her jurisdiction does not act in his or her official capacity . . . ." *State* v. *Slawek,* 114 Wis. 2d 332, 335, 338 N.W.2d 120 (1983); see also *People* v. *Vigil,* 729 P.2d 360, 365–66 (Colo. 1986); *State* v. *Hodgson,* 57 Del. 383, 385, 200 A.2d 567 (1964); *State* v. *Hart,* 149 Vt. 104, 106, 539 A.2d 551 (1987). The Connecticut legislature has enacted only one pertinent exception to this general rule. General Statutes § 54-156[3] permits out-of-state police officers to retain their authority only to the extent that the officers are pursuing a fleeing felon into Connecticut in order to make an arrest and that the officers' state affords reciprocity.[4] The Rhode Island legislature also has enacted a statute that allows out-of-state police officers to retain their authority as police officers to the

---

[3] General Statutes § 54-156 provides in pertinent part: "(a) Any member of a duly organized state, county or municipal peace unit of another state of the United States who enters this state in fresh pursuit, and continues within this state in such fresh pursuit, of a person, in order to arrest him on the ground that he is believed to have committed a felony in such other state, shall have the same authority to arrest and hold such person in custody as has any member of any duly organized state, county or municipal peace unit of this state to arrest and hold in custody a person on the ground that he is believed to have committed a felony in this state. . . .

"(f) The provisions of this section shall apply only to those states which by their laws grant similar rights to the duly constituted officers of this state."

[4] The state has also enacted an *intrastate* exception; General Statutes § 54-1f (c); that allows police officers to "pursue the offender outside of their respective precincts into any part of the *state* in order to effect the arrest." See *State* v. *Miller,* 29 Conn. App. 207, 614 A.2d 1229, cert. granted, 224 Conn. 914, 915, 617 A.2d 170 (1992).

extent that the officers are pursuing a fleeing felon into Rhode Island in order to make an arrest.[5] Since it is undisputed that the defendant in this case was arrested in Connecticut, this statute does not apply to this case. Neither the Connecticut nor the Rhode Island legislature has recognized any other exceptions to the rule that police officers have no authority to act as police officers outside of their state.[6] Cf. Idaho Code § 67-2337 (b) ("[c]ities or political subdivisions may enter into mutual assistance compacts with other cities or political subdivisions . . . of states immediately adjacent").

The majority nevertheless reasons that because Diamanti behaved reasonably in "allowing" the defendant to be taken to a Rhode Island hospital and not insisting that she be transported to a more distant Connecticut hospital, the state should not be penalized. This

---

[5] Rhode Island General Law § 12-8-3 provides that "[a]ny member of a duly organized state, county or municipal peace unit of another state of the United States who enters this state in close pursuit, and continues within this state in such close pursuit, of a person in order to arrest him on the ground that he has committed a felony in such other state, shall have the same authority to arrest and hold in custody such person, as members of a duly organized state, county or municipal peace unit of this state have, to arrest and hold in custody a person on the ground that he has committed a felony in this state."

[6] There is a common law rule that allows citizens to make an arrest. See *Commonwealth* v. *Gullick,* 386 Mass. 278, 282, 435 N.E.2d 348 (1982); *State* v. *Baton,* 488 A.2d 696, 700 (R.I. 1985); see also 1 Restatement (Second), Torts § 121, comment a. The majority reasons (p. 742) that even if Diamanti did not have the authority of a police officer, but could make the arrest as a private citizen, " '[i]t would be absurd to allow an intrusive measure such as an arrest and, yet, prohibit the lesser intrusion of requesting a blood alcohol test.' " This court has recognized a distinction in consequence, however, between unlawfully seizing a person and seizing evidence. "[A]n illegal arrest will not bar a subsequent prosecution or void a resulting conviction." *State* v. *Fleming,* 198 Conn. 255, 259, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). Rather, any evidence obtained from the illegal arrest may be suppressed. Id., 261. Thus, I find unpersuasive the majority's claim that there is no reason to distinguish between an arrest and gathering of evidence from the arrestee.

position, which at first blush appears sympathetic, disintegrates upon slightly closer scrutiny. First, Diamanti was obligated to defer to the judgment of the emergency medical personnel if it was in the best interest of the defendant's health and well-being. See *State* v. *Torgerson*, 453 N.W.2d 698 (Minn. 1990); *State* v. *Locke*, 418 A.2d 843, 847 (R.I. 1980) ("public policy require[s] . . . that police officers who have a citizen in their lawful custody be not deterred from acting to protect the well-being of such person, particularly in circumstances arising out of an emergency"). Second, if the state is penalized as a result of its inability to rely on § 14-227b (b), it is solely as a result of its own misjudgment.

The defendant's blood was drawn and tested pursuant to routine medical treatment at the hospital in Rhode Island. The results of that test could have been the subject of a search and seizure warrant prepared through proper channels and could then have been introduced into evidence. Because the state did not pursue this other avenue, but instead chose to help itself to the defendant's blood test, the results of that test were suppressed at trial. This left the state with § 14-227b (b) only upon which to rely. That the state committed what I believe to be a fatal mistake in its eagerness does not make strict adherence to the statute upon which it is forced to rely "absurd" or unworkable.

The majority cites to a few cases to support the position that a police officer, acting as a private citizen, can gather evidence outside his territorial jurisdiction. That is not the issue. As a private citizen, Diamanti was free to gather evidence within the constraints of the laws of Rhode Island. But as a private citizen he could not order intoxication tests pursuant to § 14-227b (b). As a police officer, Diamanti could have exercised his authority as a Connecticut police officer extraterritori-

ally only if there was explicit legislation enabling him to act in Rhode Island. No such extraterritorial legislation exists.

The cases cited by the majority to support their conclusion that Diamanti had the authority to act as a police officer in Rhode Island are distinguishable. In *People* v. *Preston,* 205 Ill. App. 3d 35, 563 N.E.2d 80 (1990), the issue of the police officer's authority to act as a law enforcement officer outside his state territory was not raised; the only issue placed before the court was whether a lawful arrest preceded the request for the blood test. In *State* v. *Steinbrunn,* 54 Wash. App. 506, 774 P.2d 55 (1989), the court reviewed the conduct of a Washington police officer who followed an individual being transported by ambulance to an Oregon hospital and then arrested the person and ordered the drawing of blood samples. The court concluded, however, that the Uniform Act on Fresh Pursuit enabled the officer to arrest the person in a foreign jurisdiction. Moreover, the blood test was not specifically required by statute to have been ordered by a law enforcement officer. Id., 512.

In both *State* v. *MacDonald,* 260 N.W.2d 626 (S.D. 1977), and *State* v. *Griffiths,* 113 Idaho 364, 744 P.2d 92 (1987), the courts were presented with the issue that is presently before this court. Police officers, acting outside of their jurisdictions, administered tests that only law enforcement officers could administer by statute. In concluding that the tests were admissible, neither court relied upon anything other than a theory that whatever made sense should prevail. Acting in a summary fashion without benefit of analysis, both courts acknowledged that the police officers were private citizens when they made the arrests in neighboring jurisdictions, but upheld the introduction into evidence of the test results despite the fact that only law enforce-

ment officers could administer the tests pursuant to the statute.

The majority obviates the jurisdiction issue by relying on cases that allowed law enforcement officers to act outside of their jurisdiction because private citizens could do so. The legislature has explicitly provided that only a police officer can act pursuant to General Statutes § 14-227b (b). The majority does not take issue with this statute or its plain meaning. Nor does the majority quarrel with the body of law or legislation that precludes a Connecticut officer from acting as a police officer in another state. Nevertheless, it has carved out an exception in derogation of this law without, in my opinion, authority or sufficient justification.

I respectfully dissent.