

COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 APR 28 AM 10: 54

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70043-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUAN PEDRO ORTIZ-VIVAR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 28, 2014 |
| | ) | |

VERELLEN, A.C.J. — In order to introduce blood alcohol test results, the State must produce prima facie evidence that the vials into which the blood sample were placed contained the enzyme poison and anticoagulant as required by state regulations. Here, the toxicologist testified that the tests were performed in compliance with state regulations and that the condition of the blood sample and the test results themselves revealed that there were sufficient anticoagulants and enzyme poison in the vials.

Juan Ortiz-Vivar contends that the admission of the manufacturer's certificate stating that a particular lot number of gray-topped blood vials contained specified chemicals violated the confrontation clause. But Ortiz-Vivar does not establish that this business record is testimonial in nature. The trial court did not violate the confrontation clause or abuse its discretion in admitting the certificate or the blood test results. We affirm.

FACTS

On September 2, 2011, an employee of Ace Hardware noticed a customer, Juan Ortiz-Vivar, slurring his words and stumbling around in the store. The employee observed Ortiz-Vivar leave the store and get into his car. She noticed that Ortiz-Vivar was having difficulty getting into and starting the car, as well as pulling out of the parking space. Concerned about his behavior, she called the police. Officer Aaron Cohen was the first to arrive. He noticed a strong order of alcohol emanating from the car. Officer Cohen observed a white chunky substance falling from Ortiz-Vivar's mouth. Ortiz-Vivar was slurring his words as he got out of his car. Officer Cohen caught Ortiz-Vivar to prevent him from falling to the ground. Another officer, Andrew Litke, collected a white crystal substance and turned it over to Officer Cohen. Officer Walter Martinez assisted with Spanish translation. Martinez testified that Ortiz-Vivar claimed he had four shots of tequila that afternoon. Officer Martinez observed that Ortiz-Vivar's coordination was poor, that he had a hard time standing, that his eyes were red and watery, and that his breath smelled of intoxicants. Based on Martinez's experience and training, he concluded that Ortiz-Vivar was extremely impaired. Because of his condition, Ortiz-Vivar was transported to the hospital.

Ortiz-Vivar agreed to a blood test. From his patrol car, Officer Martinez retrieved gray-topped vials provided to the police by the Washington State Patrol lab. He testified that those gray-topped vials contained a white powder but that he did not know the chemical content of that powder. Martinez observed the phlebotomist draw Ortiz-Vivar's blood. Officer Cohen also observed the blood draw and took the vials into custody afterwards.

2

Chris Johnston with the Washington State toxicology lab in Seattle performed the blood analysis and wrote the toxicology report on Ortiz-Vivar's blood. Johnston testified that it appeared the blood vials contained an anticoagulant enzyme. Johnston further testified that there was an enzyme preservative in all the gray-topped tubes used for these blood draws and identified the vials as the specific vials provided to various police agencies for blood draws in driving under the influence (DUI) cases. Over a relevance objection, the trial court admitted as a business record the manufacturer's certificate of delivery of the lot of blood vials that included the vials used to test Ortiz-Vivar's blood. Over defense objections to a lack of foundation, the court admitted the blood test results which showed that Ortiz-Vivar had a blood alcohol level of 0.1710.

A jury found Ortiz-Vivar guilty of DUI. The court imposed a sentence within the standard range. He appeals.

## ANALYSIS

Ortiz-Vivar argues that his conviction was based in part on blood test results that were not demonstrably reliable. Specifically, he contends that the prosecution failed to establish that his blood sample was properly preserved with an anticoagulant and an enzyme poison.

We review a trial court's ruling on the admissibility of a blood alcohol test result for an abuse of discretion.[1]

Before blood alcohol test results can be admitted into evidence, the State must present prima facie evidence that the test chemicals and blood sample are free from

---

[1] State v. Brown, 145 Wn. App 62, 69, 184 P.3d 1284 (2008).

any adulteration that could conceivably introduce error into the test results.[2]

RCW 46.61.506(3) requires blood tests to be performed in compliance with Washington Administrative Code (WAC) regulations promulgated by the state toxicologist. WAC 448-14-020(3)(b) provides:

> Blood samples for alcohol analysis must be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

RCW 46.61.506(4)(b) provides that prima facie evidence is evidence that supports a logical and reasonable inference of the facts sought to be proven.

In a challenge to the admission of blood alcohol test results, the trial court assumes the truth of the State's evidence and draws all reasonable inferences from it in the light most favorable to the State.[3] Once the State shows that it has complied with the WAC, the jury determines the weight to be given to the blood test result.[4]

Here, the trial court correctly determined that the State met its prima facie burden of proof. In State v. Brown, the court held that the State presented sufficient evidence that the gray-topped vials contained the necessary amounts of required chemicals.[5] There, the toxicologist stated that he knew that the blood sample vials included an appropriate combination of sodium fluoride and potassium oxalate as noted in the

---

[2] State v. Wilbur-Bobb, 134 Wn. App 624, 630, 141 P.3d 665 (2006).

[3] RCW 46.61.506(4)(b).

[4] RCW 46.61.506(4)(c).

[5] 145 Wn. App 62, 76, 184 P.3d 1284 (2008).

4

manufacturer's certificate because the blood would be clotted and no alcohol would have been detected in the sample if those chemicals were not present in the vials.[6]

In State v. Wilbur-Bobb, a photograph of the label on the vials containing the blood samples showed that the vials contained sodium fluoride.[7] The photo, together with the toxicologist's testimony that sodium fluoride was the enzyme poison required by the regulation, was sufficient.[8]

In State v. Steinbrunn, testimony that the blood samples were free of adulteration and tested in accordance with the WAC was sufficient to establish a prima facie case where the nurse testified the hospital supplied the vial, the toxicologist testified that the vial manufacturers always put anticoagulants into the type of vials it sent to the hospitals.[9]

In State v. Barefield, this court held that a toxicologist's testimony that the vial manufacturer always put anticoagulants in the vials and that the blood sample was unadulterated when he ran the tests was sufficient prima facie evidence of compliance.[10]

Here, the toxicologist testified that the tests would not have been successful had the appropriate chemicals not been in the vials and that the vials were properly sealed. Further, the toxicologist testified that the gray-topped vials were certified by the

---

[6] Id. at 71.

[7] 134 Wn. App. 627, 630-32, 141 P.3d 665 (2006).

[8] Id. at 631-32.

[9] 54 Wn. App. 506, 513, 774 P.2d 55 (1989).

[10] 47 Wn. App. 444, 458, 735 P.2d 1339 (1987).

manufacturer as having the appropriate chemical composition. The State provided an adequate foundation for the admission of the blood test results.

Ortiz-Vivar next contends the admission of the manufacturer's certificate violated his right of confrontation. The Sixth Amendment confrontation clause confers upon the accused the right "to be confronted with the witnesses against him."[11] Testimony is usually a solemn declaration or affirmation made for the purpose of establishing or proving a particular fact.[12] Business records that have been "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial" typically are not testimonial and therefore not subject to the confrontation clause.[13] We review a trial court's decision to admit or exclude business records for a manifest abuse of discretion.[14]

In a footnote, Ortiz-Vivar contends he can raise his confrontation issue for the first time on appeal, but he does not address the authority that failure to raise confrontation issues at or before trial bars any consideration on appeal. "A clear line of decisions—Melendez-Diaz, Bullcoming, Jasper, and Hayes—requires that a defendant raise a Sixth Amendment confrontation clause claim at or before trial or lose the benefit

---

[11] Crawford v. Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[12] Id. at 51.

[13] Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009).

[14] State v. Zeigler, 114 Wn.2d 533, 538, 789 P.2d 79 (1990).

of the right."[15] The same rule applies to the article I, section 22 confrontation clause right of the Washington Constitution.[16] Neither does he offer any manifest error theory.

Even if he had properly preserved the issue, he does not establish that the certificate was testimonial.

The manufacturer's certificate simply certified that the products ordered by the lab were "in compliance with the current FDA Quality System Requirements (QSR) as stipulated in 21 CFT part 820."[17] The product number was listed, along with a description and a lot number for the vials that were manufactured to the state toxicologist specifications for a particular draw volume and the presence of potassium oxalate and sodium fluoride. The toxicologist testified that the certificate was kept as a business record, showing that the gray-topped vials were ordered from the manufacturer containing the appropriate chemicals and listing the particular vials contained in the specific lot number identified on the manufacturer's certificate.

Ortiz-Vivar objected to the admission of the certificate only for lack of relevance. The trial court concluded that the certificate was relevant and admissible under the exceptions to the hearsay rule as a business record. Health care documents often qualify as business records.[18]

_____

[15] State v. O'Cain, 169 Wn. App. 228, 248, 279 P.3d 926 (2012) (citing Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); Bullcoming v. New Mexico, ___ U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); State v. Jasper, 174 Wn.2d 96, 271 P.3d 876 (2012); State v. Hayes, 165 Wn. App. 507, 265 P.3d 876 (2012), review denied, 176 Wn.2d 1020 (2013)).

[16] Id. at 252.

[17] Ex. 11.

[18] See Ziegler, 114 Wn.2d at 540 (lab report ordered by nontestifying physician held admissible as business record where testifying physician relied on report in

Here, the toxicologist testified about his familiarity with the gray-topped vials that were purchased for the express purpose of blood analysis. He further testified that the manufacturer's certificate contained the same lot number as the gray-topped vial used to analyze Ortiz-Vivar's blood. The manufacturer's certificate did not contain any blood test results and merely listed the lot number for the vials that were ordered to the state toxicologist's specifications. The testimony of the toxicologist establishes a legitimate business purpose, and Ortiz-Vivar does not establish that the certificate was prepared in anticipation of litigation.

Ortiz-Vivar relies upon Brown as authority that such certificate is inadmissible hearsay. But the court in Brown did not address a business records analysis, mentioned only in passing the potential for a confrontation clause concern, and ultimately concluded that any error in admitting the certificate was harmless under the constitutional harmless error analysis. The key to Brown is that the toxicologist testified that "the samples would have been clotted and would contain no alcohol in the absence of the chemicals" and that "there was other sufficient evidence proving that the vials contained the required stabilizer and preservative."[19] Here, the toxicologist provided similar testimony as to Ortiz-Vivar's blood sample.[20]

---

treatment of patient); State v. Doerflinger, 170 Wn. App. 650, 664-65, 285 P.3d 217 (2012) (radiologist report confirming treating physician's diagnosis of nasal fracture properly held admissible as a business record), review denied, 177 Wn.2d 1009 (2013).

[19] Brown, 145 Wn. App. at 76.

[20] In Brown, the court also noted that the label on the vials had been admitted. Id. at 72. Even though the labels were not admitted here, the toxicologist's testimony renders any confrontation concern harmless beyond a reasonable doubt.

Ortiz-Vivar filed a statement of additional grounds, arguing that he should not serve any jail time because of the initiative he has undertaken in seeking counseling. This is the same request that he made below. The court sentenced him to 364 days, 359 days suspended, provided he meets certain conditions including five days of actual confinement. Ortiz-Vivar does not assert that the sentence was illegal. He does not establish any grounds for this court to alter the time he must serve in jail.

Affirmed.

WE CONCUR: