STATE OF CONNECTICUT *v.* ANNA M. LEE
(14749)

PETERS, C. J., BORDEN, BERDON, NORCOTT and KATZ, Js.

Argued October 29, 1993—decision released March 16, 1994[*]

---

* March 16, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*John A. East III,* deputy assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, and *John Gravelec-Pannone,* assistant state's attorney, for the appellant (state).

*Jeremiah Donovan,* special public defender, with whom, on the brief, was *Terry Sablone Donovan,* special public defender, for the appellee (defendant).

BORDEN, J. The defendant, Anna M. Lee, was convicted after a jury trial of criminal attempt to possess more than one kilogram of marijuana with intent to sell by a person who is not drug-dependent, in violation of General Statutes §§ 21a-278 (b) and 53a-49 (a) (2).[1] The defendant appealed from the judgment of conviction

[1] General Statutes § 21a-278 provides in pertinent part: "PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION OR ADMINISTRATION BY NON-DRUG-DEPENDENT PERSON. . . .

"(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

General Statutes § 53a-49 provides in pertinent part: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT . . . . (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

to the Appellate Court, which reversed the judgment of the trial court and remanded the case for a new trial. *State* v. *Lee,* 30 Conn. App. 470, 620 A.2d 1303 (1993). We granted the state's petition for certification to appeal the question of whether the Appellate Court correctly held that the trial court had improperly precluded inquiry into potential bias of the state's expert witness, a federal government employee, by virtue of pending forfeiture actions by the federal government against the defendant's property.[2] Thereafter, we granted the defendant's request, pursuant to Practice Book § 4140,[3] to review whether the Appellate Court had improperly: (1) declined to recognize a defense of "objective entrapment" in addition to the statutory defense of "subjective entrapment"; or (2) ruled that the lawfulness of investigative activities conducted in sister states is to be determined by Connecticut law rather than by the law of the state in which the investigative activity took place. We affirm the judgment of the Appellate Court.

The jury could reasonably have found the following facts. During the summer of 1990, two confidential informants, Linda and Augustus Buckley, contacted Detective Daniel Losey of the organized crime division of the Fort Lauderdale, Florida police department to inform him that the defendant, a resident of Connecticut, was interested in obtaining a large amount of marijuana for resale purposes. Posing as a drug supplier,

[2] The precise question certified was: "Whether the Appellate Court correctly held that the trial court improperly precluded inquiry into the potential bias of the state's expert witness." *State* v. *Lee,* 225 Conn. 923, 625 A.2d 824 (1993).

[3] Practice Book § 4140 provides in pertinent part: "PAPERS TO BE FILED BY APPELLANT AND APPELLEE

"(a) Upon the granting of certification, the appellee may present for review alternative grounds upon which the judgment may be affirmed provided those grounds were raised and briefed in the appellate court. Any party to the appeal may also present for review adverse rulings or decisions which should be considered on the appeal in the event of a new trial, provided that such party has raised such claims in the appellate court."

Losey telephoned the defendant at her home in Connecticut to arrange a marijuana sale. In July and August, 1990, Losey and the defendant communicated frequently by telephone in connection with the potential sale. During that time, the confidential informants also maintained contact with the defendant. The defendant eventually agreed to purchase from Losey fifty pounds of marihuana at a price of $800 per pound, for a total price of $40,000. To finance the sale, the defendant took out a loan against her house. Losey and the defendant agreed to meet in Connecticut to consummate the sale. Upon the completion of the sale, members of the federal Drug Enforcement Administration and the Connecticut statewide narcotic task force arrested the defendant.

The defendant's primary defense was entrapment under General Statutes § 53a-15.[4] The defendant, a fifty-five year old woman with no prior criminal record, testified that her son was currently incarcerated in Florida and that Augustus Buckley was in prison with him. She testified that Buckley had sent her crude, intimidating letters and that he had threatened her son's life. She further testified that Buckley had urged her to hire a private attorney to get her son out of jail and had offered to facilitate a drug deal in order to raise money for the attorney. She testified that Buckley had threatened her son's life if she failed to go through with the deal, and that he had offered to arrange for both a purchaser and seller of marijuana. It was in this context, she asserted, that she had agreed to purchase the drugs from Losey.

---

[4] General Statutes § 53a-15 provides: "ENTRAPMENT AS DEFENSE. In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct."

In her appeal to the Appellate Court, the defendant's principal claim was that she had been unable to present her defense of entrapment fully, because the trial court had improperly denied her requests for access to information about the state's confidential informants, particularly, Augustus Buckley. *State* v. *Lee,* supra, 30 Conn. App. 477. The Appellate Court applied the balancing test established in *Rovario* v. *United States,* 353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957),[5] which weighs the state's interest in confidentiality against the defendant's right to prepare a defense, and concluded that disclosure of the information had been required. *State* v. *Lee,* supra, 480. Accordingly, the Appellate Court reversed the judgment of conviction and remanded the case to the trial court for a new trial, in which the state will be required either to disclose Buckley's whereabouts or to produce him as a witness. Id., 481. The state did not petition for certification to appeal that issue, and it is not before us.

The Appellate Court reviewed three additional issues that are relevant to this appeal. The Appellate Court concluded that the trial court had improperly restricted cross-examination of the state's expert witness. We granted the state's petition for certification to appeal that issue. The Appellate Court further upheld the trial court's refusal, on the defendant's motion to dismiss, to apply Florida law regarding the effect of the police investigative activity. The Appellate Court also upheld the trial court's refusal to recognize a defense of objective entrapment. We granted the defendant's request to consider these issues, since they will likely arise again in the event of a new trial.[6]

[5] Accord *State* v. *Richardson,* 204 Conn. 654, 657–59, 529 A.2d 1236 (1987); *State* v. *McDaniel,* 176 Conn. 131, 133, 405 A.2d 68 (1978).

[6] The Appellate Court reviewed a total of seven issues. First, the Appellate Court upheld the trial court's denial of the defendant's motion to dismiss, based upon the trial court's determination to apply Connecticut rather than Florida law to the police investigative activity. The Appellate Court

I

We first consider the certified issue. The state claims that the Appellate Court incorrectly concluded that the trial court had improperly precluded inquiry into the potential bias of an expert witness for the state. Specifically, the state argues that the trial court correctly prevented the defendant from questioning the state's expert witness, a federal government employee, regarding federal forfeiture actions then pending against the defendant's property. We agree with the state that the trial court was not required to permit such questioning.

then reviewed six additional issues that would likely arise on retrial, namely: (1) whether the trial court had properly refused to recognize a defense of objective entrapment; (2) whether the trial court had improperly restricted cross-examination of the state's expert witness; (3) whether the trial court had abused its discretion by admitting evidence concerning firearms that the police had seized at the defendant's residence; (4) whether the trial court had abused its discretion in excluding evidence regarding the dismissal of other criminal charges against the defendant; (5) whether the trial court had abused its discretion by refusing to permit the defendant to question prospective jurors about their attitudes toward undercover law enforcement; and (6) whether the trial court had abused its discretion by refusing to permit the defendant to question prospective jurors about their attitudes toward entrapment.

The Appellate Court ruled in the defendant's favor on the second and sixth additional issues; *State* v. *Lee,* supra, 30 Conn. App. 485, 490; and the state petitioned for certification to appeal both issues. We granted the state's petition limited to the second issue. *State* v. *Lee,* 225 Conn. 923, 625 A.2d 824 (1993). The defendant did not petition for certification to appeal. After the state's petition was granted, however, the defendant sought pursuant to Practice Book § 4140; see footnote 3; to add to the appeal the question of dismissal under Florida law, and the question of objective entrapment. Although it is unusual for questions to come before us in this manner, we permitted it in the circumstances of this case. Because the question we certified, namely, the scope of cross-examination of the state's expert witness, is not the question upon which the Appellate Court based its judgment, namely, nondisclosure of the informant information, the Appellate Court's judgment to reverse the judgment of conviction and to remand the case for a new trial could not be affected by our grant of certification. It is more efficient, however, to settle in the current appeal the defendant's questions that will likely arise on the remand.

The following facts are relevant to this claim. At trial, the state called special agent David Hoyt of the federal Drug Enforcement Administration to testify as an expert witness. Hoyt testified to the usual tactics employed to monitor drug trafficking and the use of informants. Hoyt also explained the price, quantity and quality of various grades of marijuana.

On cross-examination, the defendant attempted to elicit information from Hoyt concerning pending civil forfeiture actions, arising from the same transaction as the criminal prosecution, brought by the United States government against the defendant's property.[7] The state objected on grounds of prejudice. The defendant argued that the questions revealed Hoyt's potential bias and motive to testify because Hoyt's employer, the United States government, stood to profit from a guilty verdict. The trial court sustained the state's objection and barred any questioning on the topic.[8]

---

[7] The United States government sought forfeiture of the defendant's home, vehicle and $40,000. See *United States* v. *One Parcel of Property Located at 288 Butlertown Road, Montville,* United States District Court, Docket No. 290CV804 (D. Conn. Jan. 23, 1992); *United States* v. *One Household Finance Company Check in the Amount of $40,000 Payable to Anna Lee,* United States District Court, Docket No. 390MC110 (D. Conn., stipulation for compromise settlement Jan. 15, 1992); *United States* v. *One 1983 Cadillac Eldorado,* United States District Court, Docket No. 290CV00988 (D. Conn. Dec. 30, 1991).

[8] The defendant began Hoyt's cross-examination with questions that confirmed that Hoyt was an employee of the United States government. The following colloquy then ensued:

"[Defense Counsel]: That's the same United States that's going to take away Anna Lee's house if—

"[The State]: Objection, Your Honor.

"The Court: Sustained. Ladies and gentlemen of the jury, I'll ask you to be excused. . . . Now, first I'm going to ask that the monitor prepare a transcript of the days activities for the appropriate authorities to review. Counsel like to be heard with regard to your objection?

"[The State]: Your Honor, I think it's highly prejudicial. It's going well beyond the scope of cross-examination—the direct examination, Your Honor. I think it may even lay the grounds for a mistrial, at this point, Your Honor.

"[Defense Counsel]: May it please the Court. This goes directly to this witness' bias and motive to testify. His employer is the United States of

The Appellate Court agreed with the defendant and ordered the trial court, on remand, to permit questioning regarding potential bias of the expert witness. *State v. Lee,* supra, 30 Conn. App. 485. Relying on our decision in *State v. Santiago,* 224 Conn. 325, 618 A.2d 32 (1992), in which we concluded that the confrontation clause[9] required that the defendant be permitted to

America. His employer stands to gain by the outcome of this court decision. If this defendant is found guilty in this court decision, the United States will use this—this guilty verdict in order to—as a matter of res judicata. Your Honor isn't aware of the background, let me set it forth. There are pending, right now, in Federal Court three cases, Your Honor. One involves the forfeit of $40,000. One involves the forfeiture of Anna Lee's house, and one involves the forfeiture of Anna Lee's vehicle. If those vehicles are forfeited, Your Honor—I'm sorry, if those things are forfeited—if those res are forfeited, the profits from those res will go directly to the treasury of the United States who, we know, is David Hoyt's employer. David Hoyt, as an employee of the United States, I think, and knowing Agent Hoyt's reputation I'm sure this is true, is a loyal employee of the United States. His employer stands to gain by the outcome of this case.

"This is a classic cross-examination with respect to the bias of the witness to testify. So there's absolutely nothing different about it or nothing strange about it. It doesn't contravene any of the Court's instructions to me. It has nothing to do with the sentence in this case or the sentencing of Anna Lee. It has to do with this witness' bias.

"It seems to me, Your Honor, that that's so clear. That Your Honor's suggestion that my cross-examination should be sent to the appropriate authorities is a, kind of, judicial threatening of my defense of this witness. And I wish Your Honor would, having heard this argument, indicate that there was nothing improper about the argument; overrule the objection and not make me have to try the rest of this case terrified that I'm going to be disciplined by some judicial body.

"The Court: Well, I'm not going to overrule the objection. I'm going to sustain the objection. And I am going to require counsel to conform to the rules of the court, which have existed for a long period of time, including whatever enforcement procedures those rules contain. I'll instruct the defense attorney not to refer before the jury, to the matters having to do with the possible outcome in other cases pending in federal court. As you know, the jury is to determine whether the defendant is guilty or not guilty of the charges, which have been brought in this case, based upon the evidence presented here by the State and the defense if the defense determines to present any evidence. And having ruled on the matter, I'll ask the sheriff to bring the jury back." The defendant took an exception.

[9] The confrontation clause of the sixth amendment to the United States constitution, applicable to the states through the due process clause of the

inquire into the relationship between a state's witness and the police department, the Appellate Court concluded that restricting cross-examination regarding the relationship between this case and Hoyt's employer violated the defendant's right to confrontation. *State* v. *Lee,* supra, 487. The Appellate Court acknowledged that the witness' motive to distort the truth in this case was somewhat attenuated, but concluded that the weight to be accorded such evidence was a matter for the jury. Id. Accordingly, the Appellate Court determined that the confrontation clause required that if, in the new trial, "the state calls as a witness Hoyt or anyone else with a similar relationship to the civil forfeiture proceeding, the defendant may examine that witness' potential bias stemming from involvement with the forfeiture action." Id., 488.

The state now argues that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. The state contends that the trial court had discretion to limit cross-examination on the basis of considerations such as low probative value. We agree.

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution 'to confront the witnesses against him . . . .' " *State* v. *Lubesky,* 195 Conn. 475, 481, 488 A.2d 1239 (1985), quoting *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination; *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); because cross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is

fourteenth amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

tested. *State* v. *Randolph,* 190 Conn. 576, 591, 462 A.2d 1011 (1983); *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982). Cross-examination concerning "motive, interest, bias or prejudice . . . is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Lewis,* 220 Conn. 602, 621, 600 A.2d 1330 (1991). Moreover, a party is ordinarily permitted to inquire into the bias of a witness by demonstrating that the witness' employer has an interest in the outcome of the litigation. See, e.g., *Pennsylvania R. Co.* v. *Chamberlain,* 288 U.S. 333, 342–43, 53 S. Ct. 391, 77 L. Ed. 819 (1933); *Thurber Corp.* v. *Fairchild Motor Corp.,* 269 F.2d 841 (5th Cir. 1959). The denial or undue restriction of the right to confrontation constitutes constitutional error. *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Ouellette,* 190 Conn. 84, 101, 459 A.2d 1005 (1983).

This does not mean, however, that any employment relationship between the witness and one who stands to gain or lose by a verdict automatically opens the door to mandated cross-examination for bias, no matter how attenuated the relationship between that witness' testimony and the employer's stake in the outcome of the case. "It does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware* v. *Van Arsdall,* 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Thus, the con-

frontation right is "not absolute and is subject to reasonable limitation." *State* v. *Vitale,* 197 Conn. 396, 401, 497 A.2d 956 (1985).

It is undisputed that a conviction in this case would have benefited the United States government in its forfeiture actions against the defendant's property, because a conviction in a criminal case collaterally estops the defendant from disputing, in a federal forfeiture action, the facts that support the conviction. See *United States* v. *Monkey,* 725 F.2d 1007, 1010 (5th Cir. 1984); *United States* v. *$31,697.59 Cash,* 665 F.2d 903 (9th Cir. 1982); *United States* v. *Land & Buildings Located at 420 Moon Hill Road,* 721 F. Sup. 1, 3 (D. Mass. 1988), aff'd, 884 F.2d 41 (1st Cir. 1989). The question therefore is whether the benefit to the United States government is sufficiently linked to the testimony of Hoyt so that the constitutional right of confrontation required the trial court to permit the defendant to cross-examine Hoyt for bias arising from his status as an employee of the United States government. Put another way, was the degree of attenuation between Hoyt's testimony and the potential gain to the United States government such that the confrontation clause was violated by the trial court's preclusion of the inquiry? We conclude that no constitutional violation occurred here.

This case is different from *State* v. *Santiago,* supra, 224 Conn. 325, upon which the Appellate Court relied. In *Santiago,* the state's key eyewitness to a homicide in Hartford had previously been employed by the Hartford police department as a patrolman, and he personally knew two of the detectives who had investigated the crime. Id., 330. At the trial, the defendant attempted to cross-examine the witness regarding his current relationship with the Hartford police department. The state objected and the trial court sustained the objection. Id. On appeal, we concluded that the trial court's ruling

had violated the defendant's right to confrontation. We stated that "[i]t is always relevant to the issue of bias that a witness may have a relationship to the prosecuting authorities in a criminal case." Id., 332. In the circumstances of that case, in which the witness was essential to the prosecution and his relationship to the prosecuting authorities was so close, we concluded that the defendant had the right to bring the evidence before the jury.[10]

In the circumstances of this case, however, the trial court did not violate the defendant's right to confrontation by limiting cross-examination of Hoyt regarding the federal forfeiture actions. The same factors that we considered in *Santiago,* namely, the importance of the witness and the closeness of the relationship between the witness and the party interested in conviction, now lead us to the opposite conclusion. Hoyt was a minor witness who was not involved in arranging the drug sale or in the alleged entrapment. Hoyt testified on direct examination to background matters, such as the usual tactics employed in combatting drug trafficking, and to marketplace conditions relevant to determining whether the defendant had the intent to sell the marijuana. The trial court permitted the defendant unlimited cross-examination on these matters. Considering the amount and price of the transaction in this case, it cannot be said that Hoyt's testimony was critical to the state's proof on the issue of whether the defendant had the intent to sell. See, e.g., *State* v. *Williams,* 169 Conn. 322, 334, 363 A.2d 72 (1975) (quantity of narcotics is factor for jury to consider in determining intent to sell); *State* v. *Jennings,* 19 Conn.

[10] In *State* v. *Francis,* 228 Conn. 118, 126 n.6, 635 A.2d 762 (1993), we subsequently explained our holding in *State* v. *Santiago,* supra, 224 Conn. 325, as resting on "[t]wo facts, taken together": (1) that the witness in question was a "key witness for the state"; and (2) that "the witness may have had a relationship with the prosecuting authorities in the criminal case."

App. 265, 270, 562 A.2d 545 (1989). Furthermore, any connection between Hoyt and the potential gain to the United States government from the forfeiture actions was very remote. Thus, the Appellate Court incorrectly concluded that the ruling of the trial court had impaired the defendant's constitutional rights.[11]

This conclusion is consistent with the holdings of other courts on the issue. Courts in other jurisdictions have concluded that the trial court has discretion, in a criminal trial, to bar testimony relating to collateral civil forfeiture actions. See, e.g., *United States* v. *Caming*, 968 F.2d 232 (2d Cir.), cert. denied,     U.S.    , 113 S. Ct. 416, 121 L. Ed. 2d 339 (1992); *United States* v. *Stackpole*, 811 F.2d 689 (1st Cir. 1987); *Barnes* v. *United States*, 614 A.2d 902 (D.C. App. 1992); *Commonwealth* v. *Sendele*, 18 Mass. App. 755, 470 N.E.2d 811 (1984), rev. denied, 393 Mass. 1106, 474 N.E.2d 182 (1985); *Frierson* v. *State*, 839 S.W.2d 841 (Tex. App. 1992).

This does not, however, end our inquiry. If the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment, "restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . ." *State* v. *Gaynor*, 182 Conn. 501, 508, 438 A.2d 749 (1980); *State* v. *Lewis*, supra, 220 Conn. 622. We therefore proceed to the question of whether the trial court abused its discretion.

It is apparent from this record that the trial court improperly failed to exercise its discretion. In the discretionary realm, it is improper for the trial court to

---

[11] This case is also different from *State* v. *Milum*, 197 Conn. 602, 500 A.2d 555 (1985), in which we held that a defendant in a criminal case may, as a matter of right, demonstrate the bias of a complaining witness by introducing evidence of a civil action brought by the complaining witness against the defendant, if the civil action is based on the same underlying activity. The potential for bias if a complaining witness stands to gain from a personal lawsuit against the defendant is much greater than in the present case.

fail to exercise its discretion. *State* v. *Martin,* 201 Conn. 74, 88, 513 A.2d 116 (1986). The trial court's decision categorically prohibited all questioning on any forfeiture actions and was based on the mistaken belief that such testimony was categorically inadmissible. The trial court simply instructed the defendant not to refer to "other cases pending in federal court."[12] See footnote 8.

Ordinarily it is improper for the trial court to fail to exercise discretion if discretion is required. Nonetheless, we sustain the trial court's ruling in this case because had the trial court exercised its discretion, it could only have concluded, based upon the record in this case, that the proffered testimony was inadmissible. The probative value of the testimony the defendant sought to elicit was extremely slight because the worth of the disputed property was so small relative to the budget of the United States government. The inference that Hoyt would be likely to color his testimony on the relatively undisputed facts to which he testified on direct examination, solely because his employer, the United States government, would thereby be enriched by the value of the property sought to be forfeited, is remote and attenuated. Moreover, there is no suggestion in this record that Hoyt would have gained personally in any way from a successful forfeiture action. See footnote 14. In addition, the disputed testimony could have led to unfair prejudice against the state arising from the jury's sympathy upon learning that the defendant's house was at stake.[13] Finally, the testimony was likely to have distracted the

[12] The state contends that this error was harmless because it did not affect the verdict. We need not discuss the harmfulness of the error, however, because the Appellate Court's reversal and remand was based on an entirely different issue.

[13] The attempt to elicit such sympathy is apparent from the phrasing of the defendant's question: "That's the same United States that's going to take away Anna Lee's house . . . ." See footnote 8.

jury from the issue in the case before it, and would likely have caused confusion and wasted time, particularly if the defendant's questions caused a lengthy dispute over the merits and consequences of the forfeiture claims.

Thus, we disagree with the Appellate Court's conclusion that the trial court violated the defendant's constitutional rights by precluding her inquiry into the civil forfeiture cases. In sum, although the trial court failed to exercise its discretion, the record makes clear that, had it done so, it could have come to only one conclusion: the questions that the defendant sought to ask were too attenuated, and would have led too easily into confusing and collateral issues, to form the foundation of a legitimate inquiry into the credibility of the witness.[14] Thus, on the basis of the record in this case, we disapprove of the instruction of the Appellate Court to the trial court on this issue.

Nonetheless, because this issue was not the dispositive issue in the Appellate Court, and because the dis-

[14] We emphasize that our conclusion, namely, that the trial court could only have concluded that the proffered testimony was inadmissible, is based upon this record. In her cross-examination of Hoyt, the defendant sought only to ask the single question to which the state objected; see footnote 8; and similar questions regarding the forfeiture of the defendant's cash and motor vehicle. In her brief in this court, furthermore, the defendant represents that the only additional question she would have asked was whether Hoyt was the supervising agent in the forfeiture cases. On the basis of this record, therefore, we conclude that the trial court's ruling was correct, despite the court's failure to exercise its discretion.

We do not, however, decide the question of the exercise of the trial court's discretion in a case, or in this case on the retrial, in which the defendant makes a preliminary showing sufficient for a rational inference that a witness such as Hoyt hoped to curry favor and enhance his employment opportunities by giving testimony that would advance his employer's interest in forfeiture of the defendant's property. In such a case, there would be enough to invoke the trial court's discretion either to permit or to exclude the particular questions asked, balancing the probative value of the anticipated testimony against any countervailing factors. We leave the determination of such an issue to the discretion of the trial court.

positive issue is not before us in this appeal, our conclusion on this matter is not grounds for reversal of the ultimate judgment of the Appellate Court. We turn next, therefore, to the claims raised by the defendant pursuant to Practice Book § 4140.

## II

The defendant first claims that the trial court improperly denied her motion to dismiss based on choice of law. Specifically, she contends that because the police investigative activities in this case were conducted primarily in Florida, the law of that state governing police investigations should apply. She further contends that Florida employs an "objective test" of entrapment that conceives of the entrapment defense as a means of regulating police conduct, and argues that the police conduct in this case violated the Florida law of entrapment, which, under Florida procedural law, would have resulted in a dismissal of the charges against her. She concludes, therefore, that the charges against her in Connecticut should be dismissed. We disagree.

The Appellate Court upheld the trial court's denial of the defendant's motion to dismiss. The Appellate Court first noted that the defendant did not challenge Connecticut's jurisdiction over the case, and that Connecticut was, in fact, the proper forum. The Appellate Court concluded that this fact "leads inescapably to the application of this state's criminal code." *State* v. *Lee,* supra, 30 Conn. App. 476. Accordingly, the Appellate Court concluded that the trial court had properly denied the defendant's motion to dismiss and applied the Connecticut law of entrapment. We agree with the Appellate Court.

First, our jurisprudence regarding the dismissal of criminal charges that are preceded by an illegal arrest of the defendant is well settled. "Where the fairness of a subsequent conviction has not been impaired by

an illegal arrest, neither the federal nor the Connecticut constitution requires dismissal of the charges or a voiding of the resulting conviction." *State* v. *Fleming,* 198 Conn. 255, 263, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Miller,* 227 Conn. 363, 370, 630 A.2d 1315 (1993). The defendant has offered no reason why a different rule should apply where the purportedly illegal police conduct involved prearrest investigative activity by out-of-state officers.

Furthermore, even if we were to conclude that *Fleming* does not control this case, it is undeniable that Connecticut has jurisdiction over this offense. "[I]t is well established that jurisdiction over a criminal offense is determined by the place where the crime was committed." A. Spinella, Connecticut Criminal Procedure (1985) § 3 (A), p. 18. "The extent of a sovereignty's jurisdiction to enforce its civil and criminal laws has long been viewed as being coterminous with its territory." *State* v. *Stevens,* 224 Conn. 730, 737, 620 A.2d 789 (1993), citing *Pennoyer* v. *Neff,* 95 U.S. 714, 722, 24 L. Ed. 565 (1878). The attempted sale of drugs for which the defendant was convicted occurred entirely within Connecticut. Moreover, the defendant is a resident of Connecticut who remained within Connecticut at all times during the investigative phase of the case, even though Detective Losey telephoned her from Florida.

As the Appellate Court correctly noted, a conclusion that Connecticut has jurisdiction over the offense leads directly to the application of the Connecticut penal code. Moreover, the Connecticut penal code is well equipped to handle this case. Its provisions reach the defendant's alleged misconduct, as well as her chosen defense. We decline to apply the law of another jurisdiction merely because a portion of the police investi-

gation occurred there.[15] Thus, the Appellate Court properly declined to apply Florida law to the defendant's motion to dismiss.

## III

The defendant finally claims that the Appellate Court improperly failed to recognize a defense of "objective" entrapment under Connecticut law, in addition to the statutory defense of "subjective" entrapment. We disagree, and affirm the Appellate Court's conclusion on this claim.

The subjective test of entrapment focuses on the disposition of the defendant to commit the crime of which he or she is accused. "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then

[15] We recognize that in State v. Stevens, supra, 224 Conn. 739, we suggested a need to balance the legitimate interests of adjoining states in determining whether an extraterritorial police investigation implicates protections normally associated with the territorial concepts of jurisdiction. Stevens, however, dealt with the suppression of evidence seized by a Connecticut police officer acting in Rhode Island. There is no allegation in this case that the police officers exceeded the territorial bounds of their authority, nor does this case concern the admission or suppression of evidence.

Similarly, the cases that the defendant urges upon us, in which the courts have purportedly evaluated police conduct under the law of the jurisdiction where the conduct occurred, relate to the admission or suppression of evidence. See, e.g., Dickerson v. State, 43 Ala. App. 694, 200 So. 2d 487, cert. denied, 389 U.S. 994, 88 S. Ct. 496, 19 L. Ed. 2d 489 (1967); People v. Blair, 25 Cal. 3d 640, 602 P.2d 738, 159 Cal. Rptr. 818 (1979); State v. Cooper, 223 Kan. 175, 573 P.2d 1006 (1977); State v. Coleman, 177 Mont. 1, 579 P.2d 732 (1978), cert. denied, 446 U.S. 970, 100 S. Ct. 2952, 64 L. Ed. 2d 831 (1980); State v. Minter, 116 N.J. 269, 561 A.2d 570 (1989); Menefee v. State, 640 P.2d 1381 (Okla. Crim. 1982); State v. Rector, 82 Or. App. 466, 729 P.2d 1 (1986), rev. denied, 302 Or. 614, 733 P.2d 449 (1987); Jones v. Commonwealth, 228 Va. 427, 323 S.E.2d 554 (1984), cert. denied, 472 U.S. 1012, 105 S. Ct. 2713, 86 L. Ed. 2d 728 (1985); State v. Kennedy, 134 Wis. 2d 308, 396 N.W.2d 765 (1986); Six Feathers v. State, 611 P.2d 857 (Wyo. 1980). Unlike the defendant's claim in this case, these cases do not involve the requirement that a prosecution over which one state has jurisdiction be dismissed, based upon out-of-state investigative activities of officers in the other state.

induce commission of the crime so that the Government may prosecute. . . . Where the Government has induced an individual to break the law and the defense of entrapment is at issue . . . the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." (Citations omitted.) *Jacobson* v. *United States,* U.S. , 112 S. Ct. 1535, 1540, 118 L. Ed. 2d 174 (1992). Thus, the subjective defense of entrapment succeeds only if the government, not the accused, is the source of the criminal design. The subjective defense fails if the accused is previously disposed to commit the crime, and the government merely facilitates or assists in the criminal scheme. Consequently, the subjective defense focuses attention on the disposition of the accused. "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." *Sorrells* v. *United States,* 287 U.S. 435, 451, 53 S. Ct. 210, 77 L. Ed. 413 (1932).

The majority of states have adopted the subjective standard for the entrapment defense, either by statute or case law. 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 5.2, p. 416; see, e.g., *Ruggs* v. *State,* 601 So. 2d 508 (Ala. Crim. App. 1992); *State* v. *Williams,* 464 So. 2d 1058 (La. App.), cert. denied, 468 So. 2d 571 (La. 1985); *State* v. *McCrillis,* 376 A.2d 95 (Me. 1977); *State* v. *Doran,* 5 Ohio St. 3d 187, 449 N.E.2d 1295 (1983); *State* v. *Salernus,* 127 Wis. 2d 460, 381 N.W.2d 290 (1986); *Rivera* v. *State,* 846 P.2d 1 (Wyo. 1993). Furthermore, the United States Supreme Court has adopted the subjective standard for the federal courts. See, e.g., *Jacobson* v. *United States,* supra, 112 S. Ct. 1535; *Hampton* v. *United States,* 425 U.S. 484, 96 S. Ct. 1646, 48 L. Ed. 2d 113 (1976); *United States* v. *Russell,* 411 U.S. 423, 93 S. Ct. 1637, 36 L.

Ed. 2d 366 (1973); *Sherman* v. *United States,* 356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958); *Sorrells* v. *United States,* supra, 287 U.S. 435.

The alternative test, adopted by some states,[16] is the objective test. Under this standard, entrapment exists if the government conduct was such that a reasonable person would have been induced to commit the crime. This standard necessarily focuses attention on the conduct of the government. "The conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. . . . For the Government cannot be permitted to instigate the commission of a criminal offense in order to prosecute someone for committing it." (Citation omitted; emphasis in original; internal quotation marks omitted.) *United States* v. *Russell,* supra, 411 U.S. 439 (Stewart, J., dissenting). "The crucial question . . . is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Sherman* v. *United States,* supra, 356 U.S. 382 (Frankfurter, J., concurring). Under an objective standard, the disposition of the accused to commit the crime is irrelevant. "To say that such conduct by an official of government is condoned and rendered innocuous by the fact that the defendant had a bad reputation or had previously transgressed is wholly to disregard the reason for refusing the processes of the court to consummate an abhorrent transaction." *Sorrells* v. *United States,* supra, 287 U.S. 459 (Roberts, J., concurring).

---

[16] See, e.g., *Grossman* v. *State,* 457 P.2d 226 (Alaska 1969); *People* v. *Barraza,* 23 Cal. 3d 675, 591 P.2d 947, 153 Cal. Rptr. 459 (1979); *State* v. *Anderson,* 58 Haw. 479, 572 P.2d 159 (1977); *State* v. *Cooper,* 248 N.W.2d 908 (Iowa 1976); *People* v. *Jamieson,* 436 Mich. 61, 461 N.W.2d 884 (1990); *Baca* v. *State,* 106 N.M. 338, 742 P.2d 1043 (1987); *State* v. *Pfister,* 264 N.W.2d 694 (N.D. 1978); *Commonwealth* v. *Jones,* 242 Pa. Super. 303, 363 A.2d 1281 (1976); *State* v. *Knight,* 159 W. Va. 924, 230 S.E.2d 732 (1976).

The Connecticut legislature has chosen to adopt the subjective defense of entrapment. General Statutes § 53a-15 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct." See footnote 4.

This statute codifies prior Connecticut case law, particularly *State* v. *Marquardt,* 139 Conn. 1, 89 A.2d 219 (1952), and *State* v. *Avery,* 152 Conn. 582, 211 A.2d 165 (1965). Commission to Revise the Criminal Statutes, Penal Code Comments, Connecticut General Statutes (1971), comment to § 53a-15. *Marquardt* was our first occasion to apply a defense of entrapment in a criminal case, and the standard we employed was subjective: "[I]f the criminal intent or the willing disposition to commit the crime originates in the mind of the accused and the criminal offense is completed, the fact that the opportunity is furnished or the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him for it constitutes no defense. On the other hand, if the evil intent and the criminal design originate in the mind of the government agent and the accused is lured into the commission of the offense charged in order to prosecute him for it, when he would not have committed an offense of that general character except for the urging of the agent, no conviction may be had." *State* v. *Marquardt,* supra, 5. Since its codification, § 53a-15 has consistently been interpreted to impose a subjective standard. See *State* v. *Hawkins,* 173 Conn. 431, 378 A.2d 534 (1977), habeas corpus granted on other grounds, 617 F. Sup. 932, rev'd, 806 F.2d 39 (2d Cir. 1986), cert. denied, 481 U.S. 1020, 107 S. Ct. 1903, 95 L. Ed. 2d 509 (1987); *State*

v. *McNally,* 173 Conn. 197, 377 A.2d 286 (1977); *State* v. *Marino,* 23 Conn. App. 392, 580 A.2d 990, cert. denied, 216 Conn. 818, 580 A.2d 63 (1990).

As the subjective entrapment doctrine has been applied in Connecticut, the defendant has the initial responsibility to present sufficient evidence that the state induced him or her to commit the offense charged. *State* v. *Hawkins,* supra, 173 Conn. 436. Once that burden has been met, however, the burden shifts to the state to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. *State* v. *McNally,* supra, 173 Conn. 202.

The defendant now advocates adoption of a two-tiered approach to entrapment, modeled after the law of New Mexico. See, e.g., *Baca* v. *State,* 106 N.M. 338, 742 P.2d 1043 (1987). The defendant proposes that the defense of entrapment be expanded to include cases in which the defendant was not predisposed to commit the crime *or* the police conduct exceeded the bounds of proper investigation. Thus, the defendant seeks to add a judicially created defense of objective entrapment to the statutory defense of subjective entrapment. Specifically, she proposes that, if the defense has been properly raised, the trial court should first evaluate the investigative actions of the police, and if they do not satisfy proper standards, dismiss the case. If this hurdle is passed, she proposes that the question should then be submitted to the jury with an instruction on subjective entrapment. The defendant contends that the saving clause of General Statutes § 53a-4[17] and the court's inherent power to protect its own processes provide authority for judicial adoption of the proposed defense.[18]

[17] General Statutes § 53a-4 provides: "SAVING CLAUSE. The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions."

[18] The defendant also claims that the due process clause of the Connecticut constitution provides the requisite authority. She has not, however, pro-

We decline the defendant's invitation so to amend our penal code. Although the defendant is correct that § 53a-4 permits us to recognize principles of criminal liability and defenses in addition to those created by statute; *State* v. *Walton,* 227 Conn. 32, 45, 630 A.2d 990 (1993); we are not free to fashion a defense that would be inconsistent with a provision of the code. Section 53a-4 specifically provides that such a supplemental defense must "not [be] inconsistent with . . . provisions [of the penal code]." See footnote 17.

Adoption of an objective standard of entrapment would substantially abrogate the present provision of our penal code. Section 53a-15 specifically centers the defense around the disposition of the defendant rather than the conduct of the police. Under the statute, it is a defense that the defendant "was induced to [engage in proscribed conduct] by a public servant . . . and that the defendant did not contemplate and would not otherwise have engaged in such conduct." General Statutes § 53a-15. Under an objective test of entrapment, the defendant's disposition would become irrelevant. A person who was predisposed to commit the charged offense, and might have committed it regardless of the contribution of the police, would be entitled to acquit-

---

vided any state constitutional analysis. In the absence of such analysis, we decline to undertake a state constitutional inquiry. *State* v. *Joly,* 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

In this connection, unfounded in the record is the dissent's assertion that the reason that the defendant did not raise, in this court, the claim of entrapment as a matter of law under General Statutes § 53a-15 is "probably because the trial court refused to allow her the opportunity to fully develop the defense of entrapment." See *Berdon, J.,* dissenting, footnote 6. One searches the defendant's briefs in vain for either the claim of entrapment as a matter of law under § 53a-15 or a hint of a suggestion that the motivation attributed to the defendant by the dissent has any basis in fact.

tal solely because of police practices. This result plainly contravenes the intent of the statute, which provides that a defendant is entitled to an entrapment defense only if he or she would not otherwise have contemplated or engaged in the proscribed conduct.

The defendant's suggestion to bifurcate the defense into two portions, an objective test applied by the judge and a subjective test applied by the jury, does not change this result.[19] The possibility that a defendant predisposed to commit a crime may be acquitted of that crime by the objective portion of the defense makes the proposal inconsistent with the statutory defense.

The judgment is affirmed.

In this opinion PETERS, C. J., and NORCOTT, J., concurred.

---

[19] The dissent's insistence that a court applied defense of objective entrapment, in addition to and procedurally antecedent to a jury applied defense of subjective entrapment, is necessary to protect our judicial processes overlooks the fact that this defendant, both in this trial and on the retrial, has been and will be permitted to subject her evidence of entrapment to the fact-finding processes of the jury. In this trial, her defense of entrapment, based upon the evidence she was permitted to present, would have—if believed by the jury, or even if credited enough to raise a reasonable doubt as to her guilt—resulted in her acquittal, because it would have established at the least a reasonable doubt based upon the statutory subjective defense of entrapment. Indeed, such a conclusion is implicit in the fact that the trial court submitted the statutory defense to the jury, and the state does not claim that the evidence should not have been so submitted.

Upon the retrial, the defendant will be permitted to bolster her evidence by any evidence, favorable to her defense of entrapment, that she can elicit from Buckley, the government informant. If the second jury believes the defendant's evidence, or if that evidence raises in the jury's collective mind a reasonable doubt about her guilt, it will be required to acquit her.

Thus, the dissent's approach, besides adding a defense that is inconsistent with General Statutes § 53a-15, would, in this case, substitute the court for the jury as fact finder regarding not only the conduct of the state, but also the predisposition of the defendant. We are persuaded that General Statutes §§ 53a-4 and 53a-15 preclude such a result, and we are, therefore, also unpersuaded that such a result would be an appropriate exercise of our supervisory authority.

BERDON, J., with whom KATZ, J., joins, concurring in part and dissenting in part.[1] I agree with the defendant that we should adopt a defense of objective entrapment in addition to the statutory subjective defense. The statutory defense provides: "[I]t shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so . . . for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct." General Statutes § 53a-15. The objective defense, recognized by some jurisdictions as the sole available defense,[2] and in other jurisdictions in conjunction with the subjective defense,[3] is established if the trial judge finds that the activities of government agents were objectively "likely to instigate or create a criminal offense." *United States* v. *Russell,* 411 U.S. 423, 441, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) (Stewart, J., dissenting). The defense is available only in "situations involving highly egregious police activity, [and applies] irrespective of the defendant's predisposition to commit the crime." *State* v. *Rockholt,* 96 N.J. 570, 576, 476 A.2d 1236 (1984).

In order to put the issue in its proper perspective, the *limited* evidence[4] that the trial court allowed the

[1] I agree with part II of the majority opinion, but disagree with part III. I agree with Justice Katz' separate opinion with respect to part I.

[2] See, e.g., *Coffey* v. *State,* 585 P.2d 514, 521 (Alaska 1978); *People* v. *Barraza,* 23 Cal. 3d 675, 689–90, 591 P.2d 947, 153 Cal. Rptr. 459 (1979).

[3] See, e.g., *State* v. *Rockholt,* 96 N.J. 570, 579, 476 A.2d 1236 (1984); *Baca* v. *State,* 106 N.M. 338, 340, 742 P.2d 1043 (1987).

[4] The defendant points out in her brief that the trial court "repeatedly refused to order the state to disclose informant information crucial to the establishment of the defense, sustained objections to defense questions to the undercover agent concerning informant activities, declined to permit questioning concerning informant activities even outside the presence of the jury, declined to analyze the evidence that was permitted to be presented in order to determine whether objective entrapment existed, declined to dismiss the case on these grounds and refused to instruct the jury as requested concerning objective entrapment."

defendant to introduce should be reviewed. The defendant, Anna M. Lee, a fifty-five year old woman, had no previous criminal record. Her attorney described her as "slightly daffy" during final arguments before the jury. Her son Mario was imprisoned in Florida on a conviction of conspiracy to possess cocaine. During Mario's imprisonment, and while his case was on appeal, the defendant received letters from other inmates threatening her son's life. The defendant was deeply concerned about Mario's well-being, and in response to the threats she sent money orders and other items to inmates for her son's protection. She was sufficiently concerned about her son's situation to describe it in a letter to United States Senator Christopher Dodd. Dodd responded by letter, suggesting that she hire a private attorney for Mario.

The defendant decided to travel to Florida to visit with Mario when she ceased receiving calls and letters from him. She discovered that Mario had been placed in solitary confinement because of threats on his life by other inmates. When the defendant saw him, he appeared to have "heat rashes on him."

The defendant wanted to obtain the assistance of a private attorney in order to pursue her son's appeal, but had previously borrowed thousands of dollars from Household Finance Company against a line of credit secured by a mortgage on her home to pay for Mario's trial legal fees. The defendant was reluctant to borrow more because neither she nor her husband had employment. As a result of her concerns about the safety of her son and the conditions of his imprisonment, and her inability to obtain private appellate counsel for him, the defendant began to deteriorate mentally and physically and would constantly break down emotionally.

It was in this context that Augustus Buckley, a government informant and fellow inmate of Mario's,

telephoned the defendant. He told her that he was a friend of Mario's and urged her to obtain the services of a private appellate attorney for her son. When she explained her financial predicament to him, Buckley suggested a way to raise the necessary funds. He offered to arrange the delivery and sale to her of fifty pounds of high quality marijuana for $40,000, with the arrangement that his friends would purchase the marijuana from her at a substantial profit that she could in turn use to pay for Mario's legal expenses. During the same period of time, Buckley's wife, Linda, also spoke to the defendant, telling her of the deplorable prison conditions under which Buckley and Mario lived.

Buckley informed Detective Daniel Losey of the Fort Lauderdale police department that the defendant had become interested in purchasing marijuana for resale. On July 23, 1990, Losey telephoned the defendant, claiming to be a drug dealer, and stated that he had been advised of her interest in purchasing marijuana. He stated that they should use the code words "carpet" for marijuana and "feet" for each pound. Losey explained that he would not sell her less than 150 feet of carpet per transaction and quoted a price of $1000 per foot. He also stated that he required an advance payment of $3000. The defendant responded that "for the first time it's too big an amount." Although Losey reduced the quantity to fifty feet, the defendant declined to make the purchase because of the advance payment.

The next day Losey again initiated a telephone call to the defendant, but she expressed her reluctance to agree to the transaction because of the $3000 advance payment and the price per foot. Although no arrangements were agreed to during the conversation, the defendant stated to the detective: "I wish, make this deal come true, make some money."

On August 2, 1990, Losey again initiated a telephone call to the defendant and offered to reduce the price from $1000 to $800 per foot. The defendant told Losey that she had not heard from her son in a week, but had just gotten off the phone with Linda. The defendant told Losey that she had spent $50,000 from her home equity loan for Mario, including $24,000 for legal fees. She stated to Losey: "Mario and Buckley, O.K., they both told me the deal stays the way it was, the way they set up. I talked to Linda on the phone, I said talk to Danny [Losey] and see what Danny can do, because, you know, this is my first time, I no have too much money, I'm deep in the hole because Mario, what I've . . . with Mario."

Losey called the defendant again the next day, but they could not come to terms because of the advance payment. The defendant testified that, contemporaneous to these recorded telephone conversations with Losey, Buckley threatened in a telephone conversation: "I think your son's sentence will end very soon. We end his sentence very soon if you no go through with [the deal]."

Five days later, Losey again initiated a telephone call to the defendant. The defendant said she would pay cash on delivery. Losey agreed, stating the pretext that he would be making another delivery in the Connecticut area.

One week later, Losey telephoned the defendant, and she stated that she did not want to purchase the marihuana, believing that Losey and Buckley were "set[ting] her up." After Losey swore that he was not a police officer, the defendant agreed to the purchase.

The next day Losey telephoned the defendant for the seventh time, and she agreed to meet him in Connecticut in order to complete the transaction. The defendant and Losey met, proceeded to the Household Finance

Company, and she was arrested immediately after drawing a check for $40,000 against her equity line of credit. The police obtained a search warrant that same day and searched the defendant's home, recovering marijuana seeds, three small marijuana plants, Weight Watchers scales, three hunting rifles and a handgun.

This evidence demonstrates that "[e]ntrapment is a potentially dangerous tool given to police to fight crime." *Cruz* v. *State,* 465 So. 2d 516, 519 (Fla. 1985). "This does not mean, of course, that the Government's use of undercover activity, strategy, or deception is necessarily unlawful. *Lewis* v. *United States,* 385 U.S. 206, 208–209 [87 S. Ct. 424, 17 L. Ed. 2d 312] (1966). Indeed, many crimes, especially so-called victimless crimes, could not otherwise be detected. Thus, government agents may engage in conduct that is likely, when objectively considered, to afford a person ready and willing to commit the crime an opportunity to do so. *Osborn* v. *United States,* 385 U.S. 323 [331–32, 87 S. Ct. 429, 17 L. Ed. 2d 394] (1966)." *United States* v. *Russell,* supra, 411 U.S. 445 (Stewart, J., dissenting).

The allegations of fact in this case, however, reach a level that substantially deviates from acceptable police activity, painting a picture of outrageous police conduct that sickens the civilized mind and heart and cries out for the adoption of an objective entrapment defense. Justice Brandeis put it forcibly when he stated: "I am aware that courts—mistaking relative social values and forgetting that a desirable end cannot justify foul means—have, in their zeal to punish, sanctioned the use of evidence obtained through criminal violation of property and personal rights or by other practices of detectives even more revolting. But the objection here is of a different nature. It does not rest merely upon the character of the evidence or upon the fact that the evidence was illegally obtained. The obstacle to the prosecution lies in the fact that the alleged crime was

instigated by officers of the Government; that the act for which the Government seeks to punish the defendant is the fruit of their criminal conspiracy to induce its commission. The Government may set decoys to entrap criminals. But it may not provoke or create a crime and then punish the criminal, its creature." *Casey* v. *United States,* 276 U.S. 413, 423, 48 S. Ct. 373, 72 L. Ed. 632 (1928) (Brandeis, J., dissenting).

I would hold that, in addition to the subjective defense of § 53a-15 to be applied by the jury, this court should adopt a threshold objective defense decided by the court. The objective defense would enable the courts of this state to bar the prosecution of defendants who are the targets of egregious police practices such as those alleged in this case. Without the availability of an objective entrapment defense, this branch of government would be without a vehicle to express a "spontaneous moral revulsion against using the powers of government to beguile innocent, though ductile, persons into lapses . . . ." *United States* v. *Becker,* 62 F.2d 1007, 1009 (2d Cir. 1933).

The majority, however, states that we are prohibited from judicially adopting an objective defense by General Statutes § 53a-4, the saving clause of our penal code. Section 53a-4 provides that the court may recognize "other principles of criminal liability or other defenses *not inconsistent with*" the provisions of the penal code.[5] (Emphasis added.) See, e.g., *State* v. *Mess-*

---

[5] The official commentary for General Statutes § 53a-4 provides: "The purpose of this saving clause is to make clear that the provisions of sections 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not precluded by sections 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith. This does not mean, however, that the court is free to fashion additional substantive offenses, for the Code precludes, by repealing section 54-117, the notion of common law crimes." Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 1985) § 53a-4, p. 196.

*ler,* 19 Conn. App. 432, 562 A.2d 1138 (1989) (adopt-
ing common law necessity defense pursuant to § 53a-4).
The majority argues that if we were to adopt the objec-
tive defense, "the defendant's disposition [to commit
the crime] would become irrelevant."

The subjective and objective entrapment formula-
tions, however, are quite separate and distinct. The sub-
jective defense serves the purpose of protecting the
innocent citizen from police manufacture of crime,
while the objective defense serves to protect the *courts
and the public at large* from judicial sanction of outra-
geous police tactics. The subjective defense "focuses
on the conduct and propensities of the particular
defendant in each individual case: if he is 'otherwise
innocent,' he may avail himself of the defense; but if
he had the 'predisposition' to commit the crime, or if
the 'criminal design' originated with him then—
regardless of the nature and extent of the Govern-
ment's participation—there has been no entrap-
ment. . . . And, in the absence of a conclusive showing
one way or the other, the question of the defendant's
'predisposition' to the crime is a question of fact for
the jury." (Citation omitted.) *United States* v. *Russell,*
supra, 411 U.S. 440 (Stewart, J., dissenting). The egre-
giousness of the police conduct is not at issue, as the
subjective defense merely requires that the government
agents induce the commission of the crime.[6] General
Statutes § 53a-15.

On the other hand, the objective defense, applied by
the court, addresses egregious conduct of the police or

---

[6] The defendant does not argue before this court, probably because the
trial court refused to allow her the opportunity to develop fully the defense
of entrapment; see *State* v. *Lee,* 30 Conn. App. 470, 477–81, 620 A.2d 1303
(1993), and footnote 4; that as a *matter of law* she was the subject of an
entrapment under the subjective defense of General Statutes § 53a-15. See,
e.g., *United States* v. *Russell,* supra, 411 U.S. 441 (Stewart, J., dissent-
ing); *Munoz* v. *State,* 629 So. 2d 90 (Fla. 1993).

other government agents; whether the defendant had a predisposition to commit the crime is irrelevant. "Thus, the focus of this approach is . . . on 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.' [*Sherman* v. *United States*, 356 U.S. 369, 382, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958) (Frankfurter, J., concurring)]. . . . Under this approach, the determination of the lawfulness of the Government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury."[7] *United States* v. *Russell,* supra, 411 U.S. 441 (Stewart, J., dissenting).

In addition to serving different purposes, the objective and subjective defenses are activated by different factual situations. In particular, the objective defense is limited to egregious police practices such as those described by the defendant in the present case; this limitation ensures that adoption of the defense would not

---

[7] The defenses are also distinguished by the burden of proof. Once the defendant raises the subjective entrapment defense, the state bears the burden of disproving the defense beyond a reasonable doubt. General Statutes § 53a-12. The defendant, however, bears the burden of proving the objective defense by a fair preponderance of the evidence. See *Coffey* v. *State,* 585 P.2d 514, 521 (Alaska 1978); I A.L.I., Model Penal Code and Commentaries (1985) § 2.13, comment 5, p. 415. The drafters of the Model Penal Code explained the reasons for placing the burden of proving the objective defense on the defendant as follows: "Since it is not required that the defense of entrapment negative an element of the offense . . . it was believed appropriate to place the burden of proof on the defendant. The defense does not assert that the defendant has not engaged in criminal activity; nor does it truly seek to excuse or justify a criminal act. The defense is, as noted, a complaint by the accused against the state for employing unsavory enforcement techniques. The accused is asking to be relieved of the consequences of his guilt by objecting to police tactics. He may therefore be analogized to a plaintiff who in seeking relief should be required to come forward with evidence in support of his claim and to establish its main elements by a preponderance of the proof. . . ." I A.L.I., Model Penal Code and Commentaries, supra, p. 415.

"substantially abrogate the present provision of our penal code" as the majority opines. In cases of legitimate police sting operations, the objective defense will have no application, although defendants in such cases will be entitled to present their subjective defense before the jury. See *State* v. *Knight,* 159 W. Va. 924, 933, 230 S.E.2d 732 (1976) (reversing conviction for failure to allow the defendant to present his subjective defense to the jury, but holding that "[t]he evidence of entrapment was not so overwhelming as to show, under the 'objective' test, monstrous or unconscionable government conduct requiring the court to hold that entrapment was proved as a matter of law"). Because the defenses address different concerns and apply in different types of factual situations, courts have held that the coexistence of the two standards presents no conflict.[8] *Cruz* v. *State,* supra, 465 So. 2d 520; *State* v. *Knight,* supra, 159 W. Va. 932.

Our courts have the inherent power to protect the judicial processes. This court should use that power and adopt the objective defense of entrapment for two reasons. First, we have the right and the duty to refuse to allow judicial process to be used in perpetrating a

---

[8] Our recent case of *State* v. *Walton,* 227 Conn. 32, 630 A.2d 990 (1993), clearly demonstrates that the adoption of the objective defense would not offend General Statutes § 53a-4. In *Walton,* the defendant was charged with conspiracy under General Statutes §§ 53a-48 and 21a-277 (a). Section 53a-48 requires that the state prove, among other things, that the conspiracy involve the specific criminal conduct that was the subject of the agreement. The *Walton* court adopted the judicially crafted *Pinkerton* doctrine of conspiracy liability, layering it on to the statutory criminal liability set out in § 53a-48. *Pinkerton* v. *United States,* 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Under the *Pinkerton* doctrine, a conspirator may be held liable for substantive offenses committed by coconspirators that "are reasonably foreseeable as a necessary or natural consequence of the conspiracy" even though the offenses were not composed of the exact illegal conduct that was the subject of the agreement. *State* v. *Walton,* supra, 43. The court conceded that the *Pinkerton* principle was not within the language of the conspiracy statutes; id., 44; but nevertheless found that its adoption was not prohibited by § 53a-4.

wrong; anything less endangers the integrity of this branch of government. By closing the doors of our courts to egregious police conduct, we would recognize the foundation of the entrapment defense "in the public policy which protects the purity of government and its processes." *Sorrells* v. *United States,* 287 U.S. 435, 455, 53 S. Ct. 210, 77 L. Ed. 413 (1932) (Roberts, J., concurring); see R. Donnelly, "Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs," 60 Yale L.J. 1091, 1112 (1951) (preferable view grounds the entrapment defense on its purpose of protecting the integrity of judicial processes). Justice Brandeis wrote: "But it does not follow that the court must suffer a detective-made criminal to be punished. . . . This prosecution should be stopped, not because some right of [the defendant] has been denied, but in order to protect the Government. To protect it from illegal conduct of its officers. To preserve the purity of its courts." *Casey* v. *United States,* supra, 276 U.S., 423–25 (Brandeis, J., dissenting).[9]

As in *Baca* v. *State,* 106 N.M. 338, 340, 742 P.2d 1043 (1987), "[t]he case before us presents a perfect illustration of why something more than a subjective standard is needed to define entrapment." The defendant alleges that a police detective and his agent, an incarcerated informant, initiated all the contacts with the defendant and preyed on her extreme vulnerability by: targeting her for the sting despite her lack of any previ-

---

[9] Certainly this protection is not a foreign concept; on the civil side courts have refused to entertain actions that are against public policy. *Sorrells* v. *United States,* supra, 287 U.S. 455; see, e.g., *Pappas* v. *Pappas,* 164 Conn. 242, 246, 320 A.2d 809 (1973) ("clean hands doctrine is applied not for the protection of the parties but for the protection of the court"). Justice Roberts wrote in *Sorrells*: "Always the courts refuse their aid in civil cases to the perpetration and consummation of an illegal scheme. . . . Neither courts of equity nor those administering legal remedies tolerate the use of their process to consummate a wrong. The doctrine of entrapment in criminal law is the analogue of the same rule applied in civil proceedings." *Sorrells* v. *United States,* supra, 455 (Roberts, J., concurring).

ous criminal record; telling her that the life of her son imprisoned in Florida was endangered as long as he remained incarcerated; promising her she would obtain a sufficient amount for her son's appellate fees because they would arrange not only the sale of the marijuana to her but also the purchase of those drugs by others from her; and threatening her with the death of her son when she wavered about purchasing the marijuana. The result: the defendant's sentence, a fourteen year prison term with seven years to serve.

We are a civilized nation. The conduct alleged in this case on the part of the police and their agents, if true, is outrageous and inconsistent with common decency— it offends my sense of justice. "[W]hen the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration. Moreover, such conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing." *United States* v. *West,* 511 F.2d 1083, 1085 (3d Cir. 1975); see *Baca* v. *State,* supra, 106 N.M. 340 (adopting the objective defense in response to a factual scenario where the defendant's status in the police sting was "nothing more than a conduit, conveying cocaine from a police informant to a policeman"). In the face of the conduct alleged by the defendant in this case, in the first instance when applying the objective defense, her predisposition or lack thereof should be irrelevant. Justice Frankfurter stated there are some "methods employed on behalf of the Government to bring about conviction that cannot be countenanced. . . . Public confidence in the fair and

honorable administration of justice . . . is the transcending value at stake." *Sherman* v. *United States,* supra, 356 U.S. 380 (Frankfurter, J., concurring).

The second reason that I would use our inherent powers to adopt the objective defense is to deter outrageous police practices. The Model Penal Code explains the deterrence rationale for the objective defense as follows: "The extraordinary measure of freeing a defendant to deter the police is taken for several reasons. No other effective remedy to discourage the police is available as a practical matter; the ordinary civil or criminal sanctions are inadequate to prevent overreaching in the use of police instigation, persuasion or deceit. In spite of the defendant's moral guilt in committing the crime, he will enlist much popular sympathy if he has acted because of shocking police inducement, at least if his crime itself is not too shocking. In part, the entrapment defense is a response to such sympathy. Furthermore, the chief aims of the criminal law are to prevent people from engaging in socially harmful conduct and to instruct them in the basic requirements of good citizenship. It is consistent with these purposes to recognize a defense based upon those unsavory police methods that have the effect of fostering criminality." I A.L.I., Model Penal Code and Commentaries (1985) § 2.13, comment 1, p. 407.

Yet, the deterrent value of the defense is undermined if available only to those who are willing to brave the evidentiary character assassination employed by the state to prove predisposition. This problem is a factor that motivated the American Law Institute to adopt the objective entrapment defense. See I A.L.I., Model Penal Code and Commentaries, supra, § 2.13, comment 3, p. 412. "Law enforcement officers may feel free to employ forbidden methods if the 'innocent' are to be freed but the habitual offenders, in whom they have greater interest, will nevertheless be punished." Id.

On remand, I would direct the trial court, as a preliminary matter, to hear evidence on whether the conduct of the police and their agents reached an egregious level beyond legitimate police enforcement activity. If so, then the charges against the defendant that are related to that conduct should be dismissed. If not, the defendant at trial should be permitted to raise the subjective entrapment defense for the jury's consideration.[10]

KATZ, J., with whom BERDON, J., joins, concurring in part and dissenting in part. I agree with the majority's conclusion that the Appellate Court improperly held that the trial court was required to allow the questioning in issue as a matter of constitutional entitlement. I disagree, however, with the majority's conclusion that the trial court's ruling prohibiting the question was nevertheless correct. I agree with the majority's resolution in part II. I disagree with the majority's resolution in part III and join in the dissenting opinion by Justice Berdon.

The majority is correct that the right of confrontation did not require the trial court to permit the defendant to cross-examine David Hoyt for bias arising from his status as an employee of the United States govern-

---

[10] I do not find it necessary to reach the constitutional due process issues raised by the defendant. See *United States* v. *Russell,* supra, 411 U.S. 431–32 (conduct of law enforcement officers may be "so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction"); *United States* v. *Porter,* 764 F.2d 1, 8 (1st Cir. 1985); *United States* v. *Twigg,* 588 F.2d 373, 380 (3d Cir. 1978) ("we have no trouble in concluding that the governmental involvement in the criminal activities in this case has reached 'a demonstrable level of outrageousness' "); *United States* v. *Graves,* 556 F.2d 1319, 1322 (5th Cir. 1977), cert. denied, 435 U.S. 923, 98 S. Ct. 1485, 55 L. Ed. 2d 516 (1978); P. Marcus, "The Due Process Defense in Entrapment Cases: The Journey Back," 27 Am. Crim. L. Rev. 457 (1990); see also *Munoz* v. *State,* 629 So. 2d 90 (Fla. 1993) (holding that, despite legislative adoption of subjective standard, due process guarantee of Florida constitution would mandate objective standard in cases involving egregious police activities).

ment. Once cross-examination sufficient to satisfy the sixth amendment has been allowed, it falls to the sound judicial discretion of the trial judge to decide whether to restrict the scope of cross-examination. *State* v. *Lewis*, 220 Conn. 602, 622, 600 A.2d 1330 (1991). In addition, as the majority points out, the trial court improperly failed to exercise its discretion when it "categorically prohibited all questioning on any forfeiture actions . . . based on the mistaken belief that such testimony was categorically inadmissible."

I do not agree, however, that "had the trial court exercised its discretion, it could *only* have concluded, based upon the record in this case, that the proffered testimony was inadmissible." (Emphasis added.) I do not believe that the proffered testimony was, as a matter of law, so remote and attenuated, that the jury, following a proper limiting instruction, would have had its sympathy so unduly aroused had the questioning been allowed. Nor do I think that the proceedings would have been so protracted and chaotic. In my opinion, the trial court could have gone either way; that is to say, the trial court could have exercised its discretion and allowed the questions or exercised its discretion and prohibited the questions.[1] Had the trial court done either, on this basis of the record in this case, I would find that there had been no abuse of discretion.

I see no reason to preempt the trial court from determining whether certain cross-examination material is attenuated to the point of being inadmissible because of relevancy or possible prejudice. Ultimately it is for the trial court, in its discretion, to rule as an evidentiary matter, and we review accordingly. Both parties agree that the dispositive issue in the Appellate Court

---

[1] In addition to the question posed, defense counsel indicated in his brief that he would also have asked, had he not been foreclosed with the threat of disciplinary proceedings, whether Hoyt was the supervising agent in the forfeiture actions.

is not before us in this appeal, and that there is to be a new trial. I would allow the trial court at this new trial to start with a clean slate and exercise its judicial discretion as it deems appropriate should this area of inquiry be revisited.